Catherine Weiss
(cweiss@lowenstein.com)
Amanda Sewanan *(admission pending)*
(asewanan@lowenstein.com)
Michelle L. Goldman
(mgoldman@lowenstein.com)
Pati Candelario
(pcandelario@lowenstein.com)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500

*Pro Bono Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.A.L.C. on behalf of himself and on behalf of his minor child, L.L.G., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Civil Action No._____ <br><br><br> **COMPLAINT** |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

PARTIES ................................................................................................................3

    A.    Plaintiffs ..................................................................................................3

    B.    Defendant .................................................................................................4

JURISDICTION AND VENUE ..............................................................................5

TAXONOMY OF THE FEDERAL AGENCIES INVOLVED ...............................6

FAMILY SEPARATION ........................................................................................7

    A.    Overview.................................................................................................7

    B.    The El Paso Family Separation Pilot .....................................................8

    C.    Launching the Family Separation Policy Along the Whole Southern Border
        .............................................................................................................15

    D.    Knowledge of and Intent To Cause Severe Trauma ...............................22

    E.    Deliberately Inhumane Implementation ................................................26

SEPARATION OF JACOB AND LEYA.................................................................32

    A.    Plaintiffs' Migration and Forcible Separation ......................................32

    B.    Jacob's Confusion, Despair, and Pain....................................................35

    C.    Leya's Terror, Inconsolability, and Withdrawal in ORR Custody ........38

    D.    First Phone Contact After Seventy-four Days .......................................40

    E.    Reunification After Ninety-three Days..................................................41

IRREVOCABLE HARM TO JACOB AND LEYA ...............................................43

    A.    Leya's Ongoing Trauma, Fear, and Anxiety ........................................44

    B.    Jacob's Ongoing Emotional and Physical Trauma ...............................45

    C.    Expert Opinion on the Irreparable Harm Caused by Family Separation ..............46

JURISDICTIONAL FACTS ................................................................................48

    A.    The Due Care Exception Does Not Apply ...........................................49

    B.    The Discretionary Function Exception Does Not Apply. .....................49

        1.    Defendant's separation and treatment of Jacob and Leya violated the Constitution. ...........................................49

        2.    Defendant's separation and treatment of Jacob and Leya violated federal law. ....................................................52

        3.    Defendant's separation and treatment of Jacob and Leya violated the Flores Consent Decree (the "Flores Agreement" or the "FSA"). ...............................................54

        4.    Defendant's separation and treatment of Jacob and Leya violated binding agency standards that govern CBP. ...............................58

            a.    CBP violated nondiscretionary agency standards and policies that require the preservation of family unity. ......................................................59

            b.    CBP failed to provide Leya and Jacob with the adequate shelter and sanitary conditions required by its nondiscretionary agency standards and policies. ....................59

            c.    CBP degraded and humiliated Jacob and Leya in violation of nondiscretionary agency standards and policies. ....................................................60

        5.    Defendant's failure to establish contact between Jacob and Leya violated binding standards that govern ORR and ICE. ....................62

CLAIMS ........................................................................................................64

PRAYER FOR RELIEF ....................................................................................72

CERTIFICATION UNDER L. CIV. R. 11.2 .......................................................74

Plaintiffs J.A.L.C. on behalf of himself and on behalf of his minor child, L.L.G., by and through their attorneys, Lowenstein Sandler LLP, bring this action under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80, against Defendant United States of America, and hereby allege as follows:

## INTRODUCTION

1.       This action concerns an inhumane, destructive, ill-conceived, and recklessly executed policy the Government deliberately designed and administered to forcibly separate parents and children who entered the United States together, many, like Plaintiffs, in search of humanitarian protection (the "Family Separation Policy").   The Government created and implemented this policy to punish and inflict emotional distress upon vulnerable immigrant families as a deterrent for future migrants seeking protection in the United States.

2.       The Family Separation Policy caused acute and long-term emotional trauma as well as physical harm to Plaintiffs and thousands of other families whom the Government tore apart without lawful cause.   In many cases, including this one, the Government literally ripped children from the arms of their parents in the middle of the night and carried them away screaming for their parents.   The Government caused further harm and trauma to these families by failing to give them any information about the whereabouts or well-being of one another or to facilitate communication between family members during their prolonged detention in separate facilities.

3.       The Government's intent to harm immigrant families seeking protection in the United States, and to use that harm to deter and intimidate future asylum-seekers, is well documented.   Leading up to the policy's execution, several senior Government officers, including former President Donald Trump and other Trump Administration officials, made repeated public statements acknowledging the policy's purpose to deter other migrants and asylum-seekers from entering the United States.

-1-

4.     Further, Government documents reveal that the Government implemented the Family Separation Policy with near total disregard for its obligation to reunify the families. Government agents generally placed parents and children in facilities thousands of miles apart and failed to initiate or maintain tracking procedures that would ensure it could successfully reunite them.  Indeed, senior immigration officials advocated for and took steps designed to prevent swift family reunification.  For example, officials directed the expedited transfer of parents into adult detention or rushed to move children into juvenile facilities for the purpose of avoiding reunifying families after a parent's quick release from criminal custody.

5.     On April 7, 2018, Plaintiffs crossed the U.S.-Mexico border (the "Southern Border") near Hidalgo, Texas, and presented themselves to U.S. Customs and Border Protection agents as a family unit seeking protection from persecution in their native country of Honduras. Within less than a day, during the predawn hours of April 8, 2018, Government agents abruptly woke Plaintiffs, accused J.A.L.C. ("Jacob") of kidnapping his then-four-year-old daughter L.L.G. ("Leya"), and ripped Leya from Jacob's arms.  The agents ignored Leya's and Jacob's cries and pleas to keep them together.[1]

6.     The Government then placed Leya in the custody of the Office of Refugee Resettlement in Grand Rapids, Michigan, approximately 1,600 miles from the detention center where it had separated Plaintiffs against their will.  The Government kept Leya and Jacob apart for approximately ninety-three days.  During this three-month period, Plaintiffs spoke to each other only twice, by telephone, with the first call occurring on June 21, 2018—more than eleven weeks

---

[1]   J.A.L.C. files a Motion to Proceed Under Pseudonym with this Complaint, and L.L.G. files this Complaint using her initials as prescribed by Federal Rule of Civil Procedure 5.2(a). Plaintiffs use the pseudonyms Jacob and Leya in the text of the Complaint for ease of reading.

after the separation.  Jacob's lawyers arranged the calls.  The Government did not facilitate these calls or any other communications between Jacob and Leya during their separation.

7.      As a result of the Government's deliberate wrongful actions under its unlawful Family Separation Policy, Jacob and Leya suffered, and continue to suffer, severe and ongoing mental, emotional, and physical trauma.

8.      Jacob now seeks redress for himself and his daughter Leya under the FTCA for the extraordinary harm they suffered and continue to suffer at the Government's hands.

## PARTIES

### A.      Plaintiffs

9.      Jacob is thirty-seven years old and was thirty-two years old when the Government forcibly separated him from Leya, his daughter.  He is the life-partner of Leya's mother, M.O.G.C. ("Melisa"[2]), with whom he has two other children.  He resides in New Brunswick, New Jersey, with Melisa and their three children.  The family has lived there since mid-2019.  Except for the time he was forcibly separated from Leya, Jacob has lived with her all her life.  Jacob is a Honduran national who is presently seeking withholding of removal and protection under the Convention Against Torture in the United States.

10.     Leya is the nine-year-old daughter of Jacob and Melisa.  Leya was four years old when the Government forcibly separated her from Jacob.  She resides with her father, mother, and siblings in New Brunswick, New Jersey.  Except for the time she was forcibly separated from her father, she has lived with him all her life.  Leya is a Honduran national who is presently seeking asylum in the United States.

---

[2]     This is a pseudonym.

11.     Jacob is a class member in *Ms. L v. United States Immigration and Customs Enforcement*, No. 18-cv-0428-DMS-MDD (S.D. Cal.), filed by the American Civil Liberties Union (the "ACLU") in February 2018 on behalf of separated parents to challenge the Family Separation Policy.  On June 26, 2018, the court preliminarily enjoined the Family Separation Policy, holding that the "practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim."[3]   The court ordered the swift reunification of class members with their children; for those under five years old, like Leya, the deadline was July 10, 2018, fourteen days after the order.

## B.     Defendant

12.     Under the FTCA, 28 U.S.C. § 2671, the United States of America is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, the U.S. Department of Homeland Security ("DHS") and its component agencies, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"); the U.S. Department of Justice ("DOJ") and its component agencies; the U.S. Department of Health and Human Services ("HHS") and its component agency, the Office of Refugee Resettlement ("ORR").  At all relevant times, federal officers referenced in this Complaint were employees of the United States working within the scope and course of their employment in these federal agencies.

13.     DHS employees, officers, and officials were responsible for detaining and separating Jacob and Leya, as well as denying them information about and communication with

---

[3]   *Ms. L v. ICE*, 310 F. Supp. 3d 1133, 1145 (S.D. Cal. 2018).

each other.  DHS employees were responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Texas, where Jacob and Leya were initially detained and separated, and for overseeing the contract detention center in New Jersey where Jacob was later transferred.

14.     HHS employees, officers, and officials, including but not limited to those working in ORR, are responsible for supervising and managing the detention of children the Government classifies as "unaccompanied."  These employees, officers, and officials are responsible for overseeing the detention of unaccompanied children in contract facilities, such as the one in Michigan where the Government sent and monitored Leya during her forced separation from Jacob.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1346(b).

16.     On April 1, 2020, Plaintiffs submitted administrative claims to DHS, ICE, CBP, and HHS.  On August 13, 2020, DOJ informed Plaintiffs that it had named DHS as the designated lead agency in the matter pursuant to 28 C.F.R. § 14.2(b)(2).  Neither DHS nor any of the agencies has responded to, or made a final disposition of, Plaintiffs' administrative claims.  Because more than six months have passed since submission of the claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all available administrative remedies.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.  Jacob has legal work authorization and is seasonally employed as a landscaper in New Jersey.  He rents an apartment in New Brunswick for himself and his family, all of whom have formed the legal intention to remain in New Jersey indefinitely.  Leya attends a public elementary school in New Brunswick.

## <u>TAXONOMY OF THE FEDERAL AGENCIES INVOLVED</u>

18.     The following organizational charts identify the federal departments and agencies

that were the primary actors in conceiving or implementing the Family Separation Policy.



## FAMILY SEPARATION

**A.    Overview**

19.    In early 2017, senior officials in the Trump Administration began to explore the possibility of separating migrant parents and children at the Southern Border.  The goal was to cause the families intense trauma, focus public attention on the forcible separations, and thereby deter other migrants, predominantly Central American families, from seeking protection in the United States.

20.    From mid-2017 through the remainder of the Administration, various federal agencies implemented different aspects and phases of the Family Separation Policy.  Their execution of the policy betrayed a level of callousness and cruelty with few counterparts in modern American history.  Federal officers abused and terrorized parents and children when tearing them apart, refused to provide them information about one another's welfare and whereabouts, defaulted on the legal obligations to track the separated families and facilitate communication between the parents and their children, and failed to prepare to reunify the families.

21.    Some officials tried to defend the Family Separation Policy by dressing it in the language of law enforcement and stressing that many of the families entered the United States illegally.  But prosecutions and convictions for immigration offenses (mainly misdemeanors) were never the point.  A significant percentage of parents, including Jacob, were not prosecuted at all but still had their children taken from them.  Most parents charged with illegal entry were sentenced to time served but remained separated from their children for months.  Criminal proceedings were a pit stop on the road to prolonged family separation.  The real deterrent—the one the Government believed would stop parents cold—was the threat of losing their children.  In the service of the goal of deterring immigration, the Government caused indelible harm to thousands of families who came to this country seeking safety.

**B.      The El Paso Family Separation Pilot**

22.     Until Defendant began forcibly separating families in 2017, parents arriving in the
United States with their children generally remained together.  Agencies within DHS would either
detain the family together during removal proceedings or release them on their own recognizance
pending removal proceedings in immigration court.[4]  When parents and children were separated
before 2017, it was typically because immigration officials had determined that the parent
presented a threat to the child's safety; the parent had an injury or illness that precluded caring for
the child; the parent had a criminal history or outstanding warrant; or immigration officials could
not confirm the familial relationship.[5]

23.     When President Trump assumed office in early 2017, his Administration began
pursuing immigration policies to curtail the number of asylum-seekers and migrants entering the
United States at the Southern Border.[6]

---

[4]   U.S. Dep't of Justice, Off. of Inspector Gen., 21-028, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 1–2 (Jan. 2021) ("*DOJ OIG Rep. 1/21*"), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf; U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-20-06, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* 5 (Nov. 25, 2019) ("*DHS OIG Rep. 11/19*"),   https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf; U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts To Reunify Children Separated from Parents at the Border* 13 (Oct. 2018) ("*GAO Rep. 10/18*"), https://www.gao.gov/assets/700/694918.pdf; U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen., OEI-BL-18-00511, *Separated Children Placed in Office of Refugee Resettlement Care* 3 & n.6 (Jan. 2019) ("*HHS OIG Rep. 1/19*"), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf.

[5]   *DHS OIG Rep. 11/19* at 5; *GAO Rep. 10/18* at 13; *HHS OIG Rep. 1/19* at 3 & n.6.

[6]   *See, e.g.*, Kevin Lemarque, *U.S. Judge Bars Trump Administration from Enforcing Asylum Ban*, CNBC (Nov. 20, 2018), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum-Seekers*, ACLU (Oct. 30, 2018), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While*

24.     The Trump Administration designed these policies in part to target Central American migrant families.  For example, on February 20, 2017, then-DHS Secretary John F. Kelly issued a memorandum outlining a comprehensive plan to block and deter migration at the Southern Border.[7]  In the memo, Secretary Kelly noted that most "unaccompanied alien children" come from El Salvador, Honduras, and Guatemala, and their parents "who reside illegally in the United States" often pay "smuggler[s] . . . several thousand dollars" to bring their children here.[8] The memo ordered ICE and CBP to initiate removal proceedings against such parents, who had typically arrived before their children and had not been apprehended at the border.[9]  Alternatively, the memo directed ICE and CBP to refer parents for criminal prosecution for "smuggling" their children into this country.  The memo explicitly instructed immigration officers to take these actions "[r]egardless of the desires for family reunification."[10]

---

*Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, Texas Tribune, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez, & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, Wash. Post, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html; Glenn Thrush, *U.S. To Begin Blocking Asylum-Seekers from Entering over Mexican Border*, N.Y. Times, Jan. 24, 2019, https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves To Curb Migrants' Asylum Claims*, Reuters, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

[7]  U.S. Dep't of Homeland Sec., *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

[8]  *Id.* at 10.

[9]  *Id.* at 11.

[10]  *Id.*

25.     Three weeks later, in early March 2017, Secretary Kelly confirmed that DHS was considering another policy—to separate migrant families at the Southern Border.  From the first mention, he made clear that the purpose of the Family Separation Policy under consideration was to deter migration.  Presuming that families would not come to the United States if they faced the intense trauma of forcible separation,[11] he stated, "Yes, I'm considering [separating families] in order to deter more movement along this terribly dangerous network.  I am considering exactly that.  [Children] will be well cared for as we deal with their parents."[12]

26.     In line with Secretary Kelly's statement, CBP launched a pilot project to separate families in the El Paso Sector of the Southern Border in March 2017.  The plan was that CBP would separate parents and children, refer the parents for prosecution for immigration offenses, and transfer them to the custody of the U.S. Marshals Service during prosecution and any associated incarceration.  Meanwhile, CBP would designate the children as "Unaccompanied Alien Child[ren]" under 6 U.S.C. § 279(g)(2) (defining term to include children under eighteen who have no parent or legal guardian present in the United States or "available to provide care and physical custody" in the United States).  CBP would then transfer the children to the custody of the Office of Refugee Resettlement in the Department of Health and Human Services, which is legally charged with the care of unaccompanied children.  6 U.S.C. § 279; 8 U.S.C. § 1232(b), (c).

---

[11]   The Family Separation Policy did not in fact achieve its anticipated goal: "The number of apprehensions of family units continued to rise throughout the Zero Tolerance period.  Border Patrol apprehended nearly 400 additional families along the Southwest Border during the 2 months Zero Tolerance was in place, during May and June 2018, as compared with the 2 months prior to the policy's implementation, from March to April 2018." *DHS OIG Rep. 11/19* at 34.

[12]   Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN, Mar. 7, 2017, https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.

27.     Pursuant to this plan, the El Paso Sector suspended what Border Patrol officials referred to as the "family unit policy," under which they had avoided referrals for prosecution of immigration offenses if the prosecution would result in family separation.[13]

28.     The U.S. Attorney's Office ("USAO") in the Western District of Texas initially resisted the about-face and the resulting referrals of parents for prosecution, noting in internal emails that "[h]istory would not judge [prosecuting family units] kindly."[14]  Nevertheless, the USAO soon agreed to prosecute parents who arrived with their children.[15]

29.     On April 11, 2017, then-Attorney General Jefferson Beauregard Sessions issued a memorandum to all federal prosecutors directing them to increase immigration prosecutions.[16]  A Border Patrol official then reached out to the USAO in New Mexico urging prosecution of parents as a deterrent to migration: "Although it is always a difficult decision to separate these families, it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally."[17]

30.     As it implemented the El Paso Sector pilot, CBP separated an increasing number of families.[18]  In October 2018, the Government Accountability Office reported that CBP separated 281 "individuals in families" from July to November 2017.[19]

---

[13]   *DOJ OIG Rep. 1/21* at 14.

[14]   *Id.*

[15]   *Id.* at 13–14.

[16]   Memorandum from Att'y Gen. Jefferson B. Sessions to All Federal Prosecutors, *Renewed Commitment to Criminal Immigration Enforcement* (Apr. 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[17]   *DOJ OIG Rep. 1/21* at 15 n.30.

[18]   *Id.* at 16.

[19]   *GAO Rep. 10/18* at 14–15.

31.     CBP's electronic systems did not have the functionality to track these early family separations; instead, Border Patrol manually created spreadsheets.  These spreadsheets contained a significant number of errors.[20]  Moreover, the use of spreadsheets in the field meant that the information was shared neither with other CBP offices nor with the other agencies that would be involved in the detention and possible removal or reunification of the parents and children.[21]  The use of error-prone manual data entry, the reliance on spreadsheets, and the lack of information-sharing among agencies meant that officials could not identify which children belonged to which parents after separating them.[22]

32.     The actual number of children separated in this early period appears to have been far higher than initial reports suggested.  A January 2019 report from the Office of the Inspector General at HHS warned that "thousands of children may have been separated during an influx that began in 2017."[23]  Subsequent lengthy investigation led the Government to conclude that it had separated 1,556 children from their parents after July 1, 2017, and released these children from Government custody before June 26, 2018.  The Government had ignored these children when it undertook to reunify the thousands of *additional* children still in its custody on that date under the preliminary injunction issued in *Ms. L v. ICE*, the ACLU class action challenging the Family Separation Policy.[24]

---

[20]   *DHS OIG Rep. 11/19* at 14–15.

[21]   *Id.*

[22]   *Id.* at 15.

[23]   *HHS OIG Rep. 1/19* at 1.

[24]   310 F. Supp. 3d at 1149–50.  Defendants in *Ms. L* arrived at the number 1,556 after convening a team of data scientists and others to compare several databases in response to a court order expanding the class to include the parents of these earlier-separated children.  Order Granting Pls.' Mot. to Modify Class Definition, *Ms. L*, No. 3:18-cv-428 (Mar. 8, 2019), ECF No. 386;

33.     The El Paso Sector separations prompted concern and criticism.   The Deputy Criminal Chief in the USAO in the Western District of Texas emailed the U.S. Attorney for that office in August 2017:

> We have now heard of us taking breast feeding defendant moms away from their infants, I did not believe this until I looked at the duty log and saw the fact we had accepted prosecution on moms with one and two year olds.  The next issue is that these parents are asking for the whereabouts of their children and they can't get a response . . . .[25]

U.S. Magistrate Judge Miguel Torres signaled the same concern in an order for additional briefing on the issue of the separations:

> In a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest.[26]

34.     ORR also sounded an early alarm.  From November 2017 through early 2018, the then-Deputy Director for Children's Programs contacted senior officials at CBP and ICE to express concern about the increased number of separated children coming into ORR custody.  He warned these and other officials that ORR would not have sufficient bed capacity if DHS implemented a larger-scale separation program and, in particular, would not have the resources to care appropriately for very young children.  Further, he cautioned that separation would harm children and undermine ORR's obligation to safeguard their best interests.[27]

---

Order Following Status Conf., *id.* (Apr. 25, 2019), ECF No. 405; Joint Status Rep., *id.* (Nov. 6, 2019), ECF No. 495.

[25]     *DOJ OIG Rep. 1/21* at 16.

[26]     *Id.*

[27]     U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen., OEI-BL-18-00510, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance*

35.     DHS responded by advising ORR *not* to plan for continued increases in the number of separated children because DHS "did not have an official policy of separating parents and children."[28]

36.     In November 2017, shortly after ORR raised concerns, CBP headquarters instructed the El Paso Sector to halt the family separation pilot.[29]

37.     After the pilot ended, the El Paso Sector provided an after-action report to Border Patrol's Acting Chief of Operations calling for greater coordination among the various agencies.[30] In addition, the U.S. Attorney for the Western District of Texas briefed high-level officials at the Department of Justice in late December 2017.[31]  His notes on the briefing referred to "significant 'pushback' from the local community, the press, and other stakeholders with regard to family separations."[32]  In particular, the notes cited Judge Torres's concerns about the parents' lack of information on the fate or whereabouts of their children, as well coverage in the *Houston Chronicle* of the Judge's remarks and other serious concerns raised by federal defenders and advocates about family separation and the Government's lack of tracking procedures.[33]  Thus, by the end of 2017, high-level officials in both CBP and DOJ were on notice that the El Paso Sector pilot had caused

---

*Policy* 15–16 (Mar. 2020) ("*HHS OIG Rep. 3/20*"), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf; *see also* 6 U.S.C. § 279(b)(1)(B).

[28]    *GAO Rep. 10/18* at 14.

[29]    *DHS OIG Rep. 11/19* at 15.

[30]    *Id.*

[31]    *DOJ OIG Rep. 1/21* at 18.

[32]    *Id.*

[33]    *Id.*; *see also* Lomi Kriel, *Trump Moves To End "Catch and Release," Prosecuting Parents and Removing Children Who Cross Border*, Houston Chronicle, Nov. 25, 2017, https://www.houstonchronicle.com/news/houston-texas/houston/article/Trump-moves-to-end-catch-and-release-12383666.php.

public outrage, harmed parents and children, and raised serious concerns about whether the Government was prepared to track and reunify the families it had separated.

### C.   Launching the Family Separation Policy Along the Whole Southern Border

38.   In December 2017, while continuing to receive reports of problems in the El Paso Sector, senior DOJ and DHS officials jointly prepared a memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration," which outlined proposed policies for suppressing family migration at the Southern Border.[34]   The first proposal was to "Increase Prosecution of Family Unit Parents."[35]   Noting that "CBP is currently executing this policy on a limited basis in the El Paso Sector," the plan was to "[i]nstruct CBP and ICE to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border."[36]   "The parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present would be placed in HHS custody as UACs ['unaccompanied alien children'].   Because the parents would be criminally prosecuted, they would be placed in the custody of the U.S. Marshal to await trial."[37]

---

[34]   *DOJ OIG 1/21* at 12.   The original memo, in marked-up form, is available at https://s3.documentcloud.org/documents/5688664/Merkleydocs2.pdf; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC News (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 (explaining that Senator Jeff Merkley's office made the December 2017 policy memorandum public); Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC News (Jan. 18, 2019), https://abcnews.go.com/Politics/leaked-memo-shows-trump-administration-weighed-separating-families/story?id=60459972.

[35]   *DOJ OIG 1/21* at 12.

[36]   *Id.*

[37]   *Id.*

39.     The goals were deterrence and publicity: "Because of the large number of violators, not all parents could be criminally prosecuted.  However, the increase in prosecutions would be reported by the media and it would have substantial deterrent effect.  A public announcement of the policy could be made before implementation."[38]   The memo called for "close coordination with DOJ, to ensure there are sufficient prosecutors at the border and sufficient U.S. Marshal's detention space."[39]

40.     The second recommendation, distinct from the first, was to "Separate Family Units."   Here again, deterrence and publicity were key: "Announce that DHS is considering separating family units, placing the adults in detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children."[40]   To accomplish family separation, the memo urged "close coordination with HHS, to ensure that sufficient capacity is available to detain the UACs."[41]   Once "legal coordination between DHS, HHS, and DOJ is complete," the memo instructed, "begin separating family units as stated above."[42]   Thus, the Government explicitly contemplated separating families regardless of whether the parents were prosecuted, a practice it in fact implemented.

41.     In the early months of 2018, as the Government considered expanding family separation to the whole Southern Border, it "focused solely on the increase in illegal entry

---

[38]   *Id.*

[39]   *Id.*

[40]   *Id.*

[41]   *Id.* at 13.

[42]   *Policy Options to Respond to Border Surge of Illegal Immigrants* 1 (Dec. 2017), https://s3.documentcloud.org/documents/5688664/Merkleydocs2.pdf.

prosecutions resulting from the El Paso Initiative" while ignoring the warning signs and the "readily available information" that underscored the problems with family separation.[43]

42.     Despite documented problems with the El Paso Sector pilot and in disregard of its "Policy Options" memo,[44] the Government failed to initiate coordination among or planning within the agencies that would be responsible for the separated parents and children.  DHS remained unprepared to "identify, track, and reunify families separated under Zero Tolerance[45] due to limitations with its information technology systems, including a lack of integration between systems."[46] Not only did the subsidiary agencies within DHS have incompatible systems, but there was "no 'direct electronic interface' between DHS and HHS tracking systems," such as they were.[47]

43.     Similarly, despite warnings from its own staff about the "shortage . . . of beds for babies" and the harms that family separation was causing to children,[48] HHS senior officials did not take or direct steps to prepare for "a future situation in which DHS routinely separated families" and did not raise its staff's concerns about family separation in existing interagency forums.[49] Instead, HHS leaders suppressed discussion of family separation by repeatedly warning ORR staff

---

[43]   *DHS OIG Rep. 1/21* at ii.

[44]   *Supra* ¶¶ 38–40.

[45]   *See infra* ¶ 46 for an explanation of Zero Tolerance.

[46]   U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-18-84, *Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 1 (Sept. 27, 2018) ("*DHS OIG Rep. 9/18*"), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[47]   *Id.* at 11.

[48]   *HHS OIG Rep. 3/20* at 15–16.

[49]   *Id.* at 17.

"to be cautious about putting information in writing" and to reserve "certain matters" for "verbal-only briefings."[50]

44.     Likewise, the Office of the Attorney General, which was "a driving force" behind family separation,[51] did not coordinate in advance of the launch with the USAOs that would be responsible for prosecutions, the U.S. Marshals Service that would be responsible for processing and incarcerating prosecuted parents, or HHS that would be responsible for the care and custody of the separated children.[52]

45.     These failures occurred despite explicit prior acknowledgement that interagency coordination would be necessary.[53]

46.     Frustrated that the rate of immigration prosecutions was not rising faster,[54] Attorney General Sessions publicly announced the Government's "Zero-Tolerance Policy for Criminal Illegal Entry" on April 6, 2018, directing the USAOs along the Southern Border to prosecute all persons who commit or attempt to commit unlawful entry under 8 U.S.C. § 1325(a) (the "Zero Tolerance Policy").[55]

---

[50]   *Id.* at 20.

[51]   *DOJ OIG Rep. 1/21* at 34.

[52]   *Id.* at 25–26.

[53]   *Id.* at 12–13 (citing *Policy Options to Respond to Border Surge of Illegal Immigration* (Dec. 16, 2017)).

[54]   *Id.* at 11.

[55]   U.S. Dep't of Justice, Off. of Pub. Affs., *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry; *see also* Memorandum from Att'y Gen. to Federal Prosecutors Along the Southwest Border, *Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)* (Apr. 6, 2018) ("Zero Tolerance Memorandum"), https://www.justice.gov/opa/press-release/file/1049751/download.

47.     Key officials in DHS, HHS, and their subsidiary agencies learned of the Zero Tolerance Policy for the first time when the Attorney General announced it publicly.[56]

48.     The prosecution and family separation strategies were overlapping, but never synonymous.  From the summer of 2017 through the summer of 2018, the Government pursued these strategies both separately and together.  In fact, the Attorney General's announcement of the Zero Tolerance Policy, which focused on prosecution, did not result in an immediate jump in the number of family separations because the USAOs at the Southern Border did not read the Zero Tolerance Memorandum as necessarily pertaining to family units.[57]

49.     The steep escalation in family separations began about a month later, on May 4, 2018, when Secretary of Homeland Security Kirstjen Nielsen signed a memorandum implementing the Zero Tolerance Policy by instructing field personnel at CBP to refer parents for prosecution regardless of whether they had arrived with their children.[58]   In a stark acknowledgement that family separations would proceed despite inadequate tracking, Secretary Nielsen's memo simultaneously advised CBP to continue using spreadsheets to record separations because improvements to the agency's electronic system were "still pending."[59]

50.     After the May 4th memo, Attorney General Sessions increased the pressure on the USAOs to prosecute all parents referred by DHS.  The U.S. Attorney for the Western District of

---

[56]   *GAO Rep. 10/18* at 12 ("DHS and HHS officials told us that the agencies did not take specific planning steps because they did not have advance notice of the Attorney General's April 2018 memo.").

[57]   *DOJ OIG Rep. 1/21* at 22–23, 27.

[58]   *DOJ OIG Rep. 1/21* at 27; *DHS OIG Rep. 11/19* at 18; U.S. Gov't Accountability Off., GAO-20-245, *Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* 13 (Feb. 2020) ("*GAO Rep. 2/20*"), https://www.gao.gov/assets/gao-20-245.pdf.

[59]   *DHS OIG Rep. 11/19* at 18.

Texas explained: "[E]ven with respect to age of the child, it was a categorical, 'We're prosecuting all.'"[60]  The U.S. Attorneys along the Southern Border took notes on a May 11th call with the Attorney General, memorializing his direction to them: "[W]e need to take away children; if care about kids [sic], don't bring them in."[61]

51.    The Zero Tolerance Policy never came close to achieving a 100% prosecution rate. In April 2018, CBP apprehended 24,299 adults without children and 4,536 adults with children, and referred 8,298 adults for prosecution, for a prosecution rate of 28.8%.[62]  ("Virtually every CBP referral results in prosecution."[63])  In May 2018, CBP apprehended 24,465 adults without children and 4,458 adults with children, and referred 9,216 adults for prosecution, for a prosecution rate of 31.9%.[64]  Because it apprehended a total of 48,764 adults without children in these two months, CBP could have made all 17,514 referrals out of this population and maintained exactly the same prosecution rate without referring a single one of the 8,994 adults with children it apprehended. "The Administration has not explained its rationale for prosecuting parents with children when that left so many other adults without children who were not being referred for prosecution."[65]

52.    The overwhelming majority of parents who were referred for prosecution and charged with misdemeanor illegal entry under 8 U.S.C § 1325 pled guilty in advance and were

---

[60]   *DOJ OIG Rep. 1/21* at 41.

[61]   *Id.* at 39.

[62]   TRAC Immigration, *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, Table 1, https://trac.syr.edu/immigration/reports/520/.

[63]   *Id.* n.4.

[64]   *Id.* Table 1.

[65]   *Id.*

sentenced to time served (i.e., the time in detention between the defendant's arrest and sentencing).[66] Nevertheless, the Government kept parents and children separated for months.

53.    The Attorney General and other high-level DOJ officials represented to the public that families would be reunited immediately after parents were released from jail.[67] But that was never the plan.  The Government had always intended to designate the children as unaccompanied and place them in the custody of ORR,[68] and in fact, CBP transferred the overwhelming majority to ORR rather than reuniting families, either in family detention or on release, when the U.S. Marshals Service turned the parents back over to DHS custody.[69]

54.    In addition, more than fifteen percent of separated parents were *not* referred for prosecution at all.[70]  Jacob was one of those parents.

55.    Between May 5 and June 20, 2018, the Government separated more than 3,000 children from their parents.[71]

56.    During this expanded phase of the Family Separation Policy, as during the El Paso Sector pilot, the Government did not effectively track the parents and children it had separated.  In June 2018, when separations were at a high point, DHS announced that it had "a central database which HHS and DHS can access and update when a parent(s) or minor(s) information changes."[72]

---

[66]   *DOJ OIG Rep. 1/21* at 4–5.

[67]   *Id.* at 50.

[68]   *See supra* ¶¶ 26, 38, 40.

[69]   *DOJ OIG Rep. 1/21* at 50.

[70]   *DHS OIG Rep. 11/19* at 33.

[71]   *Id.* at first unnumbered page; *see also id.* at 24.

[72]   U.S. Dep't of Homeland Sec., *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

Upon inspection, however, the DHS Office of the Inspector General found "no evidence that such a database exists."[73]

57.     Because of the absence of effective data collection, storage, and tracking, the Government's reported numbers of affected families shifted constantly in the years following the implementation of the Family Separation Policy.  The most recent total reported in the *Ms. L* litigation is "5,648 children known to have been separated between July 1, 2017 and Jan. 20, 2021."[74]  This number, like others before it, results from extensive efforts to reconstruct what happened.[75]

58.     As of October 25, 2022, four-and-a-half years after the initial preliminary injunction ordering reunification, a special steering committee convened by the ACLU to locate and reach out to class members in the *Ms. L* litigation was still attempting to identify and contact the missing parents of 134 separated children.[76]

**D.     Knowledge of and Intent To Cause Severe Trauma**

59.     The Government knew its Family Separation Policy would cause enormous trauma to families entering the United States along the Southern Border.  The Government intended this harm and trauma to the separated families so that other families would be deterred from seeking asylum or otherwise migrating to the United States in the future.

---

[73]   *DHS OIG Rep. 9/18* at 10.

[74]   Decl. of Marc Rosenblum, *Ms. L*, No. 3:18-cv-428 (Sept. 22, 2021), appended to Joint Status Rep., ECF No. 616.

[75]   *Id.*

[76]   Joint Status Rep. 3, *Ms. L*, No. 3:18-cv-428 (Oct. 25, 2022), ECF No. 660.

60.     Before implementing the Family Separation Policy, Government officials had received, or had knowledge of, warnings from credible sources that the policy would inflict severe harm and trauma on those subject to it, including, among others:

a.     A DHS Advisory Committee on Family Residential Centers report concluded, "The best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[77]

b.     In Senate testimony, Commander Jonathan White, the former Deputy Director of ORR for the Unaccompanied Children Program, stated that during the months leading up to the launch of the Family Separation Policy, he had cautioned the Administration, "There's no question that separation of children from parents entails significant potential for traumatic psychological injury to the child."[78]

c.     The American Academy of Pediatrics publicly warned: (1) "Proposals to separate children from their families . . . to deter immigration are harsh and counterproductive."[79]   (2) Policymakers should "always be mindful that these are vulnerable, scared children" and "exercise caution to ensure that the emotional and physical

---

[77]   U.S. Dep't of Homeland Sec., *Report of the DHS Advisory Committee on Family Residential Centers* 2, 10 (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[78]   Jeremy Stahl, *The Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.

[79]   Fernando Stein, President & Karen Remley, CEO, Am. Acad. Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://web.archive.org/web/20200301051118/https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx.

stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents, or other relatives and caregivers."[80]  (3) Family separation "can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health."[81]  (4) "Separation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of parent.  Efforts should always be made to ensure that children separated from other relatives are able to maintain contact with them during detention."[82]

61.     Knowing that family separation was inhumane and would result in significant harm to vulnerable families, several high-level Government officials publicly admitted that the purpose of the Policy was to deter future asylum-seekers.

62.     For example, on May 11, 2018, when asked about family separation, then-Chief of Staff John Kelly responded that those coming from Central America could not "easily assimilate into the United States into our modern society.  They're overwhelmingly rural people in the countries they come from—fourth, fifth, sixth grade educations are kind of the norm.  They don't speak English, obviously that's a big thing.  They don't speak English.  They don't integrate well, they don't have skills."  In light of these detriments, he said, "a big name of the game is deterrence."

---

[80]  *Id.*

[81]  Colleen Kraft, President, Am. Acad. Pediatrics, *AAP Statement Opposing Separation of Children and Parents at the Border* (May 8, 2018), https://docs.house.gov/meetings/IF/IF14/20180719/108572/HHRG-115-IF14-20180719-SD004.pdf.

[82]  Julie M. Linton et al., Am. Acad. Pediatrics, *Detention of Immigrant Children*, 139 Pediatrics No. 4, at 7 (Apr. 2017), http://publications.aap.org/pediatrics/article-pdf/139/5/e20170483/1062683/peds_20170483.pdf.

Asked directly about family separation, he admitted, "It could be a tough deterrent—would be a tough deterrent."[83]

63.     Like other officials in his Administration, former President Trump also repeatedly reinforced the intended deterrent effect of family separation.  For example:

   a.     On October 13, 2018, when speaking with reporters at the White House, former President Trump said, "If they feel there will be separation, they don't come."[84]

   b.     On December 16, 2018, former President Trump tweeted, "[I]f you don't separate, FAR more people will come."[85]

   c.     On April 28, 2019—after the Family Separation Policy had purportedly ended—former President Trump told Fox News host Maria Bartiromo that family separation had been an effective "disincentive."  Greatly exaggerating the increase in family migration after the *Ms. L* court enjoined the Policy, the President continued, "Now you don't get separated, and while that sounds nice and all, what happens is you have literally . . . ten times as many families coming up because they're not going to be separated from their children[.] . . . It's a disaster."[86]

---

[83]  Nat'l Pub. Radio, *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[84]  David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, Reuters, Oct. 13, 2018, https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

[85]  U.C. Santa Barbara, *The American Presidency Project*, Donald J. Trump Tweets of Dec. 16, 2018, https://www.presidency.ucsb.edu/documents/tweets-december-16-2018.

[86]  Kimberly Kindy, Nick Miroff, & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a 'Disaster' that Led to Surge in Border Crossings*, Wash. Post, Apr. 28, 2019, https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

64.     Accordingly, senior Government officials made an intentional decision to cause parents and children extraordinary pain and suffering to deter the migration of Central American families seeking asylum.

**E.      Deliberately Inhumane Implementation**

65.     The Government's execution of family separations made an inherently inhumane policy even crueler.

66.     Before separating the families, CBP generally detained them together in holding areas infamously referred to as *hieleras* or "iceboxes" (named for the frigid temperature inside) that were overcrowded such that the families lacked sufficient room to sit or to lie down to rest.[87] The Government failed to provide these families access to safe and sanitary restrooms, proper food and clean drinking water, clothing, bedding, and hygiene products.

67.     When separating families, CBP agents misled, verbally abused, and physically manhandled them.  Agents accused parents of having kidnapped and smuggled their own children, despite the children's obvious connection to the parent.  When parents and children would not let go of each other, the agents grabbed the children and tore them away.  In many cases, parents begged the agents not to take their children, but the immigration officials separated them anyway, and often with open contempt for the parents' and children's anguish.  Agents regularly told parents to say goodbye to their children because they would never see them again.

68.     Many parents waited in terror as they watched agents take other children from their parents, knowing that their children's names might soon be called.  Witnessing other parents and children forcibly separated compounded the trauma.  Parents had to watch the agents walk or carry

---

[87]   *DHS OIG Rep. 11/19* at 35–36 ("OIG reported that overcrowding and prolonged detention represent an immediate risk to . . . health and safety . . .").

their own screaming, crying children out of the cells and out of their sight.  The last words many parents heard were their children's calls for their help.

69.     In some cases, CBP intentionally subverted potential reunifications.  At the large CBP Central Processing Center in McAllen, Texas, for example, CBP officers stated that if parents were prosecuted for misdemeanor illegal entry and returned to the facility while their children were still there, CBP would cancel the children's transfers and reunite the families.  Senior officials decided, however, to have the adults transferred directly from court to ICE custody, rather than readmitting them where they might be reunified with their children.[88]  The decision-makers explained that CBP made this change to avoid the "paperwork" involved in readmitting the parents.[89]

70.     High-level officials at ICE appear also to have been involved in the decision to prevent swift reunification.  After learning that some families had been reunited immediately after the parents were released from criminal custody, Matthew Albence, then the head of Enforcement and Removal Operations at ICE, reportedly wrote to colleagues, "We can't have this."[90]  He argued that immediate reunification "obviously undermines the entire effort."[91]  His proposed "solutions" included transferring parents who had completed their sentences directly to ICE custody, rather

---

[88]   *DHS OIG Rep. 9/18* at 15.

[89]   *Id.*

[90]   Caitlin Dickerson, *"We Need To Take Away Children": The Secret History of the U.S. Government's Family-Separation Policy*, The Atlantic, Aug. 7, 2022, at ch. 6, https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.

[91]   *Id.*

than risking their reunification with their children in CBP custody, or sending children to HHS "at an accelerated pace" to make them unavailable for reunification with their parents.[92]

71.   The Government systematically failed to inform parents about where their children were going and what was happening to them; children were also left in the dark about the whereabouts of their parents.[93]   Moreover, the entities responsible for detaining the parents and children frequently themselves lacked critical information about the separations.   "ICE personnel reported," for example, that "they were often unaware that adults in their custody had been separated from children."[94]

72.   Similarly, the ORR shelters where children were detained reported difficulties identifying parents, especially those of young children who were unable to provide their parents' full names and contact information.[95]   Even after ORR learned the identity and location of the parent, caseworkers often could not reach anyone at the immigration detention centers where the parents were held: "[O]f 371 attempts [to contact detained parents] on a given day, 159 had been unsuccessful; the most common reason given was the detention center did not answer the phone."[96]   Outreach efforts were even less successful if the parent was in the custody of the U.S. Marshals Service, which maintained that it did not have the same obligation as DHS to share information about parents with ORR.[97]

---

[92]   *Id.*

[93]   *DHS OIG Rep. 9/18* at 12–13 (documenting inconsistent and inaccurate information CBP gave parents about their children).

[94]   *Id.* at 15.

[95]   *HHS OIG Rep. 3/20* at 25.

[96]   *Id.*

[97]   *Id.* at 26; *DOJ OIG Rep. 1/21* at 65.

73.    The Government regularly failed to facilitate parent-child communication.  Official reviews found that CBP, ICE, and ORR all lacked sufficient and consistent mechanisms for establishing and maintaining communication between separated parents and children.[98]    In hundreds of cases, parents were removed to their home countries without having had any contact with their children since the separation.[99]  The communication barriers meant that parents could not coordinate with their children regarding removal.    For example, the Government Accountability Office found that separated parents held in ICE custody were not "able to make arrangements for their children, including being removed with them."[100]  The children, typically subject to their own separate removal proceedings, lacked the advice and counsel of their parents about how to manage their cases.

74.    Parents separated from and unable to communicate with their children suffered physically, mentally, and emotionally.  As the Federal Public Defender's Office in McAllen, Texas, noted in a May 29, 2018, email to local federal judges and prosecutors: "[O]ur clients are enduring the punishment of separation from their children which is greater than any jail time they can have imposed upon them."[101]  Separated parents experienced profound desperation, anguish, and guilt when the Government tore their children away, told the parents they would never see them again, and withheld information about the children.

75.    Children separated from and unable to communicate with their parents also suffered physically, mentally, and emotionally.  Program directors and mental health clinicians in the

---

[98]    *E.g.*, *DHS OIG Rep. 9/18* at 13–15; *HHS OIG Rep. 3/20* at 25–27.

[99]    *HHS OIG Rep. 3/20* at 26.

[100]    *GAO Rep. 2/20* at second unnumbered page.

[101]    *DOJ OIG Rep. 1/21* at 44.

shelters reported that "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated. Separated children experienced heightened feelings of anxiety and loss . . . . For example, some separated children expressed acute grief that caused them to cry inconsolably."[102] Children who did not understand why they had been taken from their parents "suffered elevated levels of mental distress." For example, some who "believed their parents had abandoned them were angry and confused."[103]

76.     Lawyers for the separated children confirmed the intense trauma of their clients:

> Most children were unable to concentrate during legal screenings, the majority erupting into sobs, frequently wailing for their parents. When discussing his separated parent, one child clutched his heart and described to us how it hurt to breathe. Some children refused to speak about anything other than a separated parent. Some refused to speak at all. Others exhibited an instant and intense attachment to the lawyer they had just met, begging not to be separated after the conclusion of a legal appointment.[104]

77.     Because any data the Government collected about separated families were incomplete, contradictory, and unreliable,[105] the Government's reunification efforts were defined by chaos. Before issuing the preliminary injunction in *Ms. L*, Judge Sabraw confirmed with the Government that "there was no procedure in place for the reunification of these families."[106] Nine

---

[102]  *HHS OIG Rep. 3/20* at 21–22.

[103]  U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen., OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 10 (Sept. 2019) ("*HHS OIG Rep. 9/19*"), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[104]  Decl. of Anthony Enriquez, Esq., ¶ 8, *Ms. L*, No. 3:18-cv-428 (Nov. 2, 2018), ECF No. 292-1.

[105]  *DHS OIG Rep. 11/19* at 11–12.

[106]  310 F. Supp. 3d at 1140–41.

months later, as of March 2019, "the working group [on family reunification] still did not have a formal reunification plan in place."[107]

78.     ORR shelter staff responsible for the children reported pervasive "uncertainty around how or when reunification would happen.  For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States."[108]  Moreover, logistical issues plagued the process.  "Facilities reported that some reunifications were scheduled with little advance notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety in separated children and other children in the facility."[109]  Reunifications were also delayed long past the court-imposed deadlines.[110]

79.     The *Ms. L* court criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family.  The parents didn't know where the children were, and the children didn't know where the parents were.  And the government didn't know, either."[111]

80.     Through its statements about the Family Separation Policy's purpose to deter asylum-seekers, refusal to provide separated parents and children any information about each other's whereabouts and well-being, disregard for its duty to track separated families, indifference to its obligation to facilitate communication between separated parents and children, and failure to

---

[107]  *DHS OIG Rep. 11/19* at 24.

[108]  *HHS OIG Rep. 9/19* at 11.

[109]  *Id.*; *see also HHS OIG Rep. 3/20* at 31 (documenting delayed, botched, and failed reunifications).

[110]  *GAO Rep. 10/18* at 33.

[111]  Tr. of Status Conf. at 58, *Ms. L*, No. 18-cv-428 (July 27, 2018), ECF No. 164.

prepare for family reunification in any meaningful way, the Government evinced an intent to harm and inflict emotional distress upon the parents and children it separated.

## SEPARATION OF JACOB AND LEYA

### A.  Plaintiffs' Migration and Forcible Separation

81.     In February and March 2018, Jacob and his family faced violence and escalating death threats in Honduras from an armed group that had already attacked and killed members of their extended family.  With no hope of safety in Honduras, Jacob and his life-partner Melisa (Leya's mother) made the difficult decision to use their scarce immediate resources to pay for Jacob and Leya to attempt the difficult journey to the United States to seek humanitarian protection.

82.     On or around April 7, 2018, just one day after the Government announced its Zero Tolerance Policy, Jacob and Leya reached the United States after crossing the Rio Grande near Hidalgo, Texas.  Upon arrival in the United States, they began walking toward a bridge that was a port of entry and soon encountered CBP officials.  Carrying Leya on his shoulders, Jacob presented himself with raised hands to the CBP officers.  The CBP officers asked Jacob where he was going, and he explained that they were seeking help.  He presented the CBP officers with his Honduran identification card; Leya's birth certificate, which identifies him as Leya's father; and a notarized letter from Melisa consenting to Leya's travel with him.

83.     The CBP officers took the few belongings that Jacob and Leya had with them, including a small bag, money, clothes, Jacob's belt, and their shoelaces.  A male officer then subjected both Jacob and Leya to full-body pat-downs, feeling under their clothes and lifting Leya's skirt.  The male officer patted down Leya even though there were female officers nearby. After searching them, the immigration officers placed Leya and Jacob in a van without seatbelts,

-32-

handcuffed Jacob, and took them to the Rio Grande Valley Centralized Processing Center in McAllen, Texas.

84.     Jacob and Leya went through several stages of processing in different buildings within the large complex at the Rio Grande Valley Centralized Processing Center.  First, they entered a small office where officers searched them again, and again a male officer searched Leya despite the availability of female officers.

85.     Next, the officers took Jacob and Leya to a small building, which they refer to as a *hielera* (icebox) because air conditioners were blasting cold air.  In the *hielera*, Jacob saw a young father sitting on one of the concrete benches and crying intensely.  He asked the man what had happened, and the man explained that the officers had accused him of kidnapping his daughter and had taken her away.  Jacob felt uneasy but, at that moment, did not believe that a child would be taken from her parent without a good reason.  Jacob and Leya spent several hours in the *hielera*, with one short break during which the officers escorted them to a separate office for photographs and finger-printing.

86.     Later in the evening of April 7, 2018, officers transported them on foot from the *hielera* to a much larger building where hundreds of people were detained.  This building had many group holding areas separated by wire fencing.  The holding area where Jacob and Leya were placed had dozens of other fathers and children.  The officers gave Jacob and Leya a thin plastic mat to lie on and aluminum foil sheets to cover themselves in the cold holding cell.  Urine and used toilet paper covered the detention center's portable bathrooms, and Jacob worried about Leya's safety given their unhygienic state.  He tried to clean one of the toilets a little so Leya could use it.  Although Jacob and Leya had been unable to shower for several days, the detention center guards refused to let them bathe.

87.     Tired and hungry after their long journey, Jacob and Leya huddled together that night for comfort and warmth.  Jacob was unable to sleep with so many strangers among them and the constant noise of machines, patrolling officers, and radio chatter.  Jacob rocked Leya to sleep in his arms.  Covered with the aluminum sheets, they were uncomfortable and still cold but hopeful that they were finally safe.

88.     In the middle of the night between April 7 and 8, immigration officers began calling out names and taking children from their parents in the area where Jacob and Leya were held.  Jacob began to panic.  He heard his own name called, and the officers told him they were going to take Leya away.  They ordered Jacob to take Leya to the bathroom.  Jacob complied, leading Leya down the hall and picking a restroom that was less dirty than the others.  When they came out of the bathroom, Jacob tried to tell Leya what was happening, and she clung to him, screaming.  One officer told another to take Leya from Jacob because he was "just making her cry."  The officer grabbed Leya, pulled her away, and carried her off.  She screamed all the way down the hall and repeatedly cried out for her father, "Papi! Papi!"

89.     Crying, Jacob fell to his knees and pleaded with the officers not to take his daughter away, to bring her back to him.  In response, the officers taunted him: "Where did you get this child?  We know you stole her.  You are getting what you deserve.  God will punish you for what you have done!"  Jacob quickly responded that Leya was his daughter, that he was trying to protect her, that he had given the officers her birth certificate showing his name as her father, and that he was willing to undergo a DNA test.  The officers ignored him.

90.     Jacob was so distraught and crying so hard that the officers took him to a solitary cell.  On the way there, Jacob, who was shaking after the separation and still covered in dirt and sweat from his journey from Honduras, asked to take a shower, but the officers refused to allow

him to clean himself.  One of the officers escorting him, a Latino man wearing an especially large hat, swore at him: "Motherfucker, you're going to pay for this!  You'll never see that little girl again!"

91.     After some time in the solitary cell, still crying, Jacob saw Leya through the wire fencing as officers took her from one room to another.  Jacob heard Leya cry out for him before he lost sight of her again.  He was unable to sleep that night, and has been unable to sleep soundly since that night more than four-and-a-half years ago.

92.     That was the last time Jacob saw his daughter, and Leya saw her father, for ninety-three days.

**B.     Jacob's Confusion, Despair, and Pain**

93.     On April 8, the day following the nighttime separation, immigration officers told Jacob that he would be deported back to Honduras.  He was terrified.  He could not fathom leaving the United States without his four-year-old daughter, especially not knowing where she was.  He knew that, if he were deported to Honduras, finding Leya again would be nearly impossible and he might be killed before locating her.

94.     That same day, officers arrived to escort Jacob back to a group holding cell.  He asked where his daughter was and whether he could see her.  Jacob was frantic and afraid for Leya's well-being.  He felt empty.  He felt guilt-ridden that he had failed his daughter.  He was fixated on finding out what was happening to her.  An officer responded, "Shut your fucking mouth, you son of a bitch," and again told Jacob that he would "pay" for "kidnapping" Leya.

95.     Jacob had trouble sleeping and concentrating throughout the months following his forced separation from Leya.  He suffered a loss of appetite and grew thin.  The stress and trauma of the events left him unable to think, and his mind often went blank.  He began experiencing recurring, intense headaches, which he reported to the officers, but no medical professional ever

came to see him.  He felt confused, frustrated, and powerless.  His constant pain and suffering was further exacerbated by having no information regarding Leya's whereabouts, condition, and fate. Jacob spent much of his days praying, begging God to return Leya to him.

96.     One day in April 2018, immigration officers summoned Jacob and abruptly moved him from the Rio Grande Valley Centralized Processing Center to another detention facility.  The officers did not tell Jacob where they were taking him, the reason for the trip, or what would happen to him.  The officers moved Jacob by van and bus and shackled his hands and feet.  Upon information and belief, Jacob spent time in the Port Isabel Service Processing Center and the Laredo Detention Center, both in Texas.  His cells in the detention centers lacked windows, so night and day blended together.  This dissociation intensified Jacob's suffering as he felt lost and unable to orient where he was in relation to where he last saw Leya.

97.     At the Port Isabel Service Processing Center, a fellow detainee became infected with a virus, and Jacob was quarantined with the other detainees for many days.  There, Jacob and the other detainees were not given any mats or mattresses to sleep on.  Instead, they were forced to sleep on benches in a makeshift holding area.  At this detention center, Jacob was finally allowed to shower for the first time since arriving in the U.S. several days before.

98.     At the Laredo Detention Center, the facility was cold, but when Jacob and the other detainees asked the officers to increase the temperature, the officers replied that they had to keep the temperature low to help fight off viruses and gave each of them a thin blanket and a sweater. During this time, Jacob felt that he had developed a fever and continued to suffer from debilitating headaches.  Although Jacob reported these symptoms to the officers, no doctor examined or treated him.

99.    During the first three weeks of his detention, Jacob was unable to communicate with his family to tell them what had happened or to contact a lawyer to seek legal assistance. Eventually, a fellow detainee who had credit on a detention center phone let Jacob make a brief call to his sister "Nina,"[112] who lived in New Jersey, to tell her that he was detained and that Leya had been taken away from him.  Nina had received calls from Leya and her caseworker.  Nina told Jacob what little she knew—that Leya had been taken to Michigan.  Jacob had never heard of Michigan and had no idea where it was.

100.    On or before May 1, 2018, about three weeks after he was separated from Leya, Jacob was placed on a plane, in handcuffs and shackles, and transferred to the Elizabeth Detention Center in Elizabeth, New Jersey, a private facility operated under contract with DHS.  The Elizabeth Detention Center is approximately 2,000 miles away from the Rio Grande Valley Centralized Processing Center in McAllen where Jacob had last seen his daughter.  Immigration officers still had not provided Jacob any information about Leya's whereabouts or well-being and had not facilitated communication between them.

101.    On May 1, at the Elizabeth Detention Center, Jacob underwent a reasonable fear interview in connection with his application for humanitarian relief, and an asylum officer concluded that he was credible and had "a reasonable fear of persecution or torture" if returned to Honduras.[113]   An immigration judge at the Elizabeth Detention Center accepted the officer's conclusion and allowed Jacob to continue his case.  He was provided with a list of pro bono immigration organizations that might assist him with pursuing his claims.

---

[112]  This is a pseudonym.

[113]  DHS Form I-863, Notice of Referral to Immigration Judge (May 2, 2018).

102.    At the Elizabeth Detention Center, grief over the loss of his daughter continued to consume Jacob.  He constantly suffered from the fear that that he would be unable to reunite with her.  His fear intensified when he learned from other detained migrants and saw on television in the detention center that children had been physically, sexually, and psychologically abused in the ORR placement process.  He feared that Leya might also have been abused and was distraught that he was unable to protect her.

103.    After securing pro bono legal assistance, Jacob was finally able to obtain information about Leya and begin pursuing his case.

**C.    Leya's Terror, Inconsolability, and Withdrawal in ORR Custody**

104.    After Leya was torn from her father's arms, DHS officers transferred her to the custody of ORR.  On or around April 9, 2018, immigration officers placed Leya in an airplane— the first time she had ever been on a plane—and flew her to Grand Rapids, Michigan, a state where she had no family or friends.  She was four years old at the time.  When she arrived in Michigan, she was placed in the care of Bethany Christian Services ("BCS"), an ORR contractor.

105.    During her initial intake assessment with BCS, Leya stated that she was scared, did not feel safe, and did not know where her family was.  Leya cried constantly and begged to speak with her father, but BCS did not set up a call.

106.    BCS placed Leya with people she did not know, whose identities were withheld from and are still unknown to Jacob and Melisa, and whose identities Leya does not recall.  She spent her nights in an apartment with a woman and two children who did not speak Spanish.  Leya felt isolated and alone.  She missed her father terribly, and often woke in the early morning, unable to sleep soundly.

107. Over the following days, BCS set up standard medical screening for Leya.  Medical practitioners examined her for stomach pain and prescribed medications to help her sleep and to treat a rash she had developed.  Leya cried through much of the appointment.

108. Similarly, during early intakes by her BCS caseworker, Leya was distraught and cried loudly, pleading for her parents.  In one session, Leya was so distressed that when she attempted to eat, she choked on her food, which caused her to decline to eat.  Her caseworker reported that Leya was not able to organize her thoughts and words because she was overwhelmed and weeping.  The caseworker noted repeatedly that she could not get answers to most of the intake questions because "UC [unaccompanied child] cried during most of the session and repeatedly asked for her mother and father."[114]

109. Leya also cried throughout early individual therapy sessions.  The therapist described her as anxious and resistant.  She shared limited information about herself and would not make eye contact.  The therapist reported the following symptoms: "crying, withdrawal, stated fearfulness, catatonic repetition of phrases such as 'they left me alone.'"[115]  As time went on, she refused to attend counseling altogether.  She would not leave her classroom to see the therapist.[116]  Later still, she complied with demands that she attend sessions but continued to engage in only minimal conversation.  When asked about her feelings, she changed the subject and avoided sharing her emotions.[117]

---

[114] ORR UAC Assessment (Apr. 14, 2018).

[115] ORR Case Review (July 8, 2018) (discussing first five therapy sessions).

[116] ORR Case Review (June 8, 2018) (discussing therapy sessions as of May 9, 2018).

[117] ORR Case Review (July 8, 2018) (discussing later therapy sessions).

110.    Leya was placed in classes with other separated children.  During the weeks following the separation from Jacob, Leya's teachers reported that she had trouble concentrating and completing schoolwork and frequently broke down in tears.  The teachers also noted that she was very scared of any interaction with new adults.

111.    Despite her constant pleas, neither ORR nor BCS arranged a call with her father. Leya's extreme terror and distress continued throughout her prolonged separation from her father.

### D.    First Phone Contact After Seventy-four Days

112.    At the Elizabeth Detention Center, Jacob was finally able to arrange for his sister Nina to deposit money into his detention phone account.  He called Melisa in Honduras for the first time, and they grieved together about his separation from Leya.  Melisa had heard from Leya and confirmed that she was in Michigan.  Melisa told Jacob that, during a painful call, Leya had told her, "My daddy threw me away."  This broke Jacob's heart.  He believed that Leya was too young to understand what had happened.  He thought she would never forgive him.

113.    During a call, Nina gave Jacob a phone number for Leya's caseworker in Michigan. Jacob called this phone number every day for over a month, but no one answered or called him back.  Nina told him that the caseworker said it was not worth it for him to keep calling because he would be deported to Honduras, and Leya would stay in the United States.  This disregard for his parental rights and human need to speak with his daughter deepened Jacob's sadness and fear of never seeing his daughter again.  At no point did the Government establish communication between Jacob and Leya despite their repeated requests to Government officers to speak with each other.

114.    Jacob and Leya did not communicate with each other until June 21, 2018—seventy-four days after the Government forcibly separated them—when Jacob's attorneys arranged a call with Leya through BCS.

115.    Despite having long fought for the opportunity to speak with his daughter, Jacob was apprehensive before the call.  He felt that no words could explain to four-year-old Leya why they had been separated, convince her that he had not abandoned her and that he would find a way to get her back safely, or reassure her that he loved her.  Jacob feared that Leya would resent and blame him for their separation and the pain and trauma she had continued to endure as a result. He was also concerned that he would be unable to hide his own fear and sadness and that his feelings would further alarm Leya.

116.    When Jacob heard Leya's voice for the first time on the call, he broke into tears. He told Leya that he loved her and that he was trying to get permission for her to live with her aunt in New Jersey so that they could be closer and she could be with family.  Leya told her father that she missed him and wanted to come back to him.

### E.    Reunification After Ninety-three Days

117.    On June 26, 2018, the *Ms. L* court ordered the Government to reunite all separated parents and children under the age of five by July 10, 2018.[118]  Still, immigration officials did not discuss potential reunification with Jacob or Leya.  Instead, Jacob was made to believe that he would remain in detention and might face deportation.

118.    On July 8, 2018, two ICE officers transported Jacob from the Elizabeth Detention Center to an airport.  The officers neither notified Jacob of this move in advance nor told him where he was going, but before he boarded the airplane, they told him he was going to see his daughter.  Jacob was flown to Michigan where he was taken to the Calhoun County Jail in Battle Creek.  There, he was locked in a cell with another detainee until July 10, 2018.  Jacob again felt

---

[118] *Ms. L*, 310 F. Supp. 3d at 1149.

extremely vulnerable, alone, and disoriented.  He became worried again of losing track of where he was, and he was scared about what fate awaited him and his daughter.

119.    No Government official informed Jacob's attorneys of his transfer or of any plans to reunite him with Leya, but Jacob was allowed a phone call to his sister, whom he then asked to contact his attorneys.  His attorneys flew to Michigan and met with Jacob at the Calhoun Country Jail.  One of the ICE officers told the lawyers that Jacob had agreed to voluntary departure.  This was not so.  The attorneys acted quickly to correct this misinformation and assisted Jacob with the necessary paperwork to proceed with the release and reunification process—a procedure about which the Government had not informed Jacob.

120.    At the jail, immigration officers arranged for an unexpected video call with Leya. Again, Jacob was both very excited to finally see his daughter after three months and anxiously hopeful that they would soon be together.  However, when the call was initiated, a small boy who was looking for his father appeared on the screen.  Jacob was confused and concerned that, after everything, Leya might not actually be there and that she had been confused with another child. He felt scared that Leya was lost and that they would not be reunited.  He began to cry.

121.    Jacob's attorneys confirmed with BCS that it was preparing to release Leya and reassured Jacob that a reunification was planned.

122.    On July 10, 2018, the Government again transferred Jacob without notice to his attorneys from the Calhoun County Jail to the ICE office in Grand Rapids, Michigan.  At the Grand Rapids ICE office, Jacob was detained in shackles for hours until four migrant children who had been separated from their parents, including Leya, were brought to the office through the back garage door.

123.    During Jacob's detention in the ICE Office, the ICE officers refused his attorneys, who had learned of his transfer, entry to the facility.

124.    Just before Leya was finally brought to the ICE office, the officers unshackled Jacob. Jacob and Leya embraced for the first time in over three months, crying in each other's arms. Although they felt relieved to finally be reunited, and Jacob assured Leya that he would not allow her to be taken again, he saw something different in his daughter's eyes—a look of doubt and fear.

125.    The initial reunification was difficult for both of them. Ninety-three days of forced, unexplained separation had changed them. Jacob believed his little girl was in shock; she seemed hesitant to open up to him. She refused to speak to any other adult. Leya kept looking to Jacob with hurt, resentful, and pleading eyes. She seemed sad and scared that at any moment, they would be forcibly taken away from each other again.

126.    It was not until Leya and Jacob left for the airport together that Leya began to open up. Throughout the journey to New Jersey, where they would temporarily live with Nina, Leya clung to her father and would not leave his side. She was cautious of Jacob's attorneys, unsure of what was going to happen next.

127.    Jacob and Leya were finally able to leave behind the inhumane detention centers and cruel immigration officers, together, but the painful memories and the emotional and physical trauma have stayed with them.

## **IRREVOCABLE HARM TO JACOB AND LEYA**

128.    As a result of the Government's forced separation of Jacob and four-year-old Leya, they suffered and continue to suffer severe emotional distress, physical trauma, and impairment of their relationship.

### A.    Leya's Ongoing Trauma, Fear, and Anxiety

129.    The Government separated Leya from her father for over three months.  For a four-year-old, three months are an eternity.  Leya did not understand why she had been taken from him.  She mistakenly believed that her father abandoned her.  She spent weeks feeling scared and crying constantly for her father, and she was mistrusting of adults.  Leya did not know if she would ever see her father or her family again.

130.    The traumatic effects of her prolonged separation from Jacob persisted beyond the ninety-three days they spent apart.  After she reunited with her father, Leya refused to be out of his presence even for a moment.  She followed him everywhere he went.  After a short stay in New Jersey, the two of them moved in with Jacob's nephew in Brooklyn.  When Jacob went to work in a local bodega, he tried to leave Leya with his nephew's wife, but Leya would cry and throw herself on the floor.  His nephew's wife called him frequently so that Leya could speak to him and hear his voice to reassure her that Jacob had not been take away again.  Sometimes, Leya's fear was so great that Jacob took her to work and laid her down on a little mat under the cash register he operated during night shifts.

131.    Today, the acute trauma Leya experienced as a result of the Government's Family Separation Policy still affects her daily life.  Leya still cries and feels scared whenever her father has to leave for work or run an errand.  She feels nervous when going to school and fears that while she is out of her father's presence, someone might take him away again.  Leya is afraid of strangers and clings to her father if they come too close.  When she gets in or out of a vehicle, she needs to do so with her father out of fear that the vehicle will drive away from her with him in it.  Her intense fear of a repeat separation has robbed her of joyful, playful, carefree interactions with her father.

132.    Leya still thinks about the horrific experience of being stolen away from her father, and it brings her to tears.  She will carry that pain and fear for the rest of her life.

**B.    Jacob's Ongoing Emotional and Physical Trauma**

133.    Jacob suffered the nightmare of unknown officers physically ripping his daughter out of his arms and taking her away to an unknown place, for an unknown time, to meet an unknown fate.  The officers intensified the harm by swearing at Jacob, accusing him of having kidnapped Leya, and telling him he would never see her again.  He anguished for ninety-three days in various detention centers, not able to care for or protect his daughter.  He did not know with whom she was living or how she was treated.  He did not know if he would ever see her again.  He was prevented from communicating with her to reassure her of his love and that he was seeking to reunite with her.  Jacob brought Leya to the United States to protect her, but instead, the Government forcibly separated her from him.  As a result, Jacob suffered intense emotional distress and the total loss of contact with his little girl.

134.    More than four years after the horrific events he experienced at the Government's hands, Jacob's severe emotional and mental distress has persisted.  He suffers from ongoing and abnormal stress and worry.  He often feels overwhelmed and unable to think clearly because memories of being separated from Leya surface when he is not purposefully thinking about something else.  On a daily basis, he experiences flashbacks and triggers of the separation.  He no longer trusts leaving Leya with anyone, except for her mother and Jacob's sister.  He is constantly fearful that at any moment, the Government could separate him and Leya again.  This fear has deprived him of joyful, playful, carefree interactions with his little girl.

135.    Jacob continues to suffer from difficulty sleeping and headaches.  Nearly every night, it takes him hours to fall asleep because his mind races with thoughts about his family.  Typically, he is unable to sleep more than four or five hours each night.  The piercing headaches

that began while he was in Government detention also persist.  Frequently, he needs to take pain medication or sleep aids.  He also often feels pressure in his chest and has difficulty breathing.  Before the separation, he did not suffer from these issues and did not need to take medication on a regular basis.

136.    The forced separation permanently changed and scarred Jacob.  Because of his constant fear that the Government will take Leya away from him again, every action in life is a source of stress, fear, and renewed pain.  Every moment to Jacob bears a potential risk of renewed separation.  Jacob describes the pain of the forcible separation as having his heart ripped out of him.  After experiencing the worst in humanity—the needless, baseless stealing of a young, dependent child away from her parent with no information—Jacob finds it difficult to view the world as a safe place.

### C.    Expert Opinion on the Irreparable Harm Caused by Family Separation

137.    Scientific and medical evidence establish that the trauma caused by separating a child from her parent is likely to have extraordinarily harmful and long-lasting effects.  One review of the medical-legal psychological evaluations of thirty-one parents and children who had fallen victim to the Family Separation Policy reported that "most individuals met diagnostic criteria for at least one mental health condition such as post-traumatic stress disorder (PTSD), major depressive disorder (MDD), or generalized anxiety disorder (GAD).  While several people did not meet all diagnostic criteria for these conditions, nearly everyone exhibited hallmark features and symptoms of these three major conditions."[119]

---

[119]  Kathryn Hampton et al., *The Psychological Effect of Forced Family Separation on Asylum-Seeking Children and Parents at the US-Mexico Border: A Qualitative Analysis of Medico-Legal Documents*, Plos One, Nov. 24, 2021, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0259576.

138.    Separated parents and children exhibited common symptoms of trauma, including "feelings of confusion, general upset to severely depressed mood, constant worry/preoccupations, frequent crying, difficulty sleeping, difficulty eating (loss of appetite), recurring nightmares, and overwhelming anxiety."[120]  Many also displayed physical symptoms associated with panic, such as "racing heart, shortness of breath, and headaches," as well as hopelessness and despondency. Some parents considered suicide while separated from their children.[121]  Children tended to become aggressive and to regress, with symptoms including "bed wetting, loss of language, return to thumb sucking, and inability to control bowel movements and urination."[122]

139.    Extensive research supports particular and persistent impairment of child development, including permanent emotional and behavioral problems and brain damage.[123]  The

---

[120]  *Id.*

[121]  *Id.*

[122]  Hajar Habbach et al., Physicians for Hum. Rts., *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* (Feb. 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

[123]  *See, e.g.*, Allison Abrams, *Damage of Separating Families: The Psychological Effects on Children*, Psychol. Today (June 22, 2018) (noting that children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families; *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Sarah Reinstein, *Family Separations and the Intergenerational Transmission of Trauma*, Clinical Psychiatry News (July 9, 2018) ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."), https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma; Jeremy Raff, *The Separation Was So Long. My Son Has Changed So Much: U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child*, The Atlantic (Sept. 7, 2018) ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term[.]"), https://www.theatlantic.com/politics/archive/2018/09/trump-family-separation-children-border/569584/; Olga Khazan, *Separating Kids From Their Families Can Permanently*

American Academy of Pediatrics has explained the effects of separation on children: "[H]ighly stressful experiences, like family separation, can . . . disrupt[] a child's brain architecture and affect[] his or her short- and long-term health.  This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[124]

140.    Thus, keeping parents separated from their children with "little or no direct access to basic information about their health or general well-being, plainly causes irreparable harm."[125]

## JURISDICTIONAL FACTS

141.    Defendant has waived its sovereign immunity with respect to the claims Plaintiffs assert in this action.  28 U.S.C. § 1346(b)(1).  This court therefore has jurisdiction over this case.

142.    The FTCA contains exceptions that preclude liability for certain claims.  28 U.S.C. § 2680.

143.    The "due care exception" shields the Government from liability for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."  28 U.S.C. § 2680(a).  This exception does not apply in this case.

---

*Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, The Atlantic (June 22, 2018) (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. . . . Studies show that high levels of cortisol [, a stress hormone] . . . can suppress the immune system and change the architecture of a developing brain . . . . Another stress chemical, corticotrophin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory."),  https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/.

[124] *See* Kraft, *supra* note 81; *see also* Abrams, *supra* note 123 (noting that because a child's "secure attachment comes from the child's perceptions of his or her caregiver's availability (physical accessibility) . . . separations as brief as one week in duration could negatively impact the quality of attachments").

[125] *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018).

144.    The "discretionary function exception" shields the Government from liability for [a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion be abused." *Id.* This exception does not apply in this case.

**A.    The Due Care Exception Does Not Apply.**

145.    Defendant was not executing any statute or regulation when it devised and implemented the Family Separation Policy.  Defendant did not separate Plaintiffs pursuant to any statute or regulation.  Nor did Defendant exercise "due care" at any point in devising or implementing the Family Separation Policy, in general or as to Plaintiffs in particular.  Therefore, the due care exception does not apply, and this Court has jurisdiction.

**B.    The Discretionary Function Exception Does Not Apply.**

146.    Defendant had no discretion to implement the Family Separation Policy, particularly not in the cruel way it did, because the actions of its officers and employees violated binding obligations under the United States Constitution, federal statutes, court orders, and agency standards.  Prohibited acts cannot be discretionary.  Because Defendant had no discretion to separate Leya and Jacob nor to treat them with cruelty, the discretionary function exception does not apply, and this Court has jurisdiction.

**1.    Defendant's separation and treatment of Jacob and Leya violated the Constitution.**

147.    The Due Process Clause of the Fifth Amendment protects the right to family integrity and applies to all persons present in the United States.[126]  "The fact that [families are]

---

[126] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Kwong Hai*

lawfully detained in immigration custody does not eliminate [their] due process right to family integrity."[127]

148.    At the core of this constitutional guarantee is children's right to remain with their parents and vice versa.[128]   The Supreme Court has explained, "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[129]

149.    Jacob and Leya had a constitutional right to remain together as a family, and both the separation itself and the way it was effectuated violated the Due Process Clause of the Fifth Amendment.

150.    The Government had no legitimate, let alone compelling, reason to separate Jacob and Leya.  Jacob was neither charged with nor convicted of any crime in connection with his entry into the United States with Leya.   On information and belief, the Government made no individualized determination that separation would serve Leya's best interest, that Jacob was unrelated to Leya, or that Jacob was unfit or presented any danger to Leya.

151.    The Government's actions, including separating Jacob and Leya, impeding their ability to communicate while separated, and delaying their reunification, shock the conscience and

---

*Chew v. Colding*, 344 U.S. 590, 596–98, & n. 5 (1953); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

[127] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502.

[128] *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923).

[129] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (explaining that the liberty interest in family relationships has its source in "intrinsic human rights").

demonstrate more than deliberate indifference toward and reckless disregard for Plaintiffs' right to family integrity.

152.    The Due Process Clause of the Fifth Amendment also protects the right of every person in the United States to a fair hearing in connection with the deprivation of life, liberty, or property.

153.    The Government violated Plaintiffs' procedural due process rights by forcibly separating them without notice or an opportunity to be heard.

154.    The denial of notice and an opportunity to be heard was not supported by a legitimate or compelling Government interest.

155.    The Fifth Amendment guarantee of equal protection protects the right to be free from Government action that is motivated by a racially discriminatory intent or purpose.  Even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin, or other indicia of discriminatory intent.[130]

156.    As with the fundamental right to family integrity, the constitutional right to equal protection under the law, and to freedom from invidious discrimination by the Government on the basis of race or national origin, have long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State."[131]

---

[130] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (holding that facially neutral policy maintaining a county-wide at-large electoral system violated the Equal Protection Clause because it was "being maintained for the invidious purpose of diluting the voting strength of the black population").

[131] *Plyler*, 457 U.S. at 215.

157.     The separation and treatment of Jacob and Leya violated their constitutional right to equal protection because the Government's actions were motivated by discriminatory animus towards Central American migrants.

158.     The Government targeted Central American migrants, like Plaintiffs, for separation and harsh treatment as a means to deter others like them from pursuing legitimate immigration claims and from seeking humanitarian protection in the United States.

159.     Defendant's Family Separation Policy disproportionately affected individuals from Central America—more than ninety-five percent of the members in the *Ms. L* certified class are from Central American countries.[132]

160.     The constitutional violations involved in separating parents and children without justification were obvious and palpable given the long history of constitutional protection for family integrity and the equally long constitutional condemnation of Government policies and actions motivated by ethnic and racial animus.

161.     Defendant had no discretion to violate the Fifth Amendment to the United States Constitution.

## 2.     Defendant's separation and treatment of Jacob and Leya violated federal law.

162.     The William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), enacted by Congress in 2008, governs whether a migrant child may be designated as unaccompanied and transferred to the custody of HHS.  The Government may designate a child as unaccompanied if the child has "no parent or legal guardian in the United States" or "no parent or

---

[132] ACLU, *Family Separation by the Numbers* (Oct. 2, 2018) (reporting that of the then-known separated children between the ages of five and seventeen, ninety-six percent were from El Salvador, Guatemala, and Honduras), https://www.aclu.org/issues/family-separation.

legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g). Federal law mandates the swift transfer of an "unaccompanied alien child" ("UAC") in federal custody to HHS. 8 U.S.C. § 1232(b)(3). The purpose of a UAC designation is to protect especially vulnerable children who enter the United States without a parent or guardian.[133]

163.    Four-year-old Leya arrived in the United States with her father; in fact, she was sitting on his shoulders when they encountered CBP officers.   Upon their apprehension, Jacob presented his Honduran identification card; Leya's birth certificate, identifying him as her father; and a notarized letter from her mother consenting to their journey together.   Jacob was available to provide his daughter care and physical custody, whether on release or in family detention. Because he was not prosecuted or placed in criminal custody at any time after entering the United States with Leya, there was no period during which the Government had to hold them in separate facilities.

164.    For these reasons, Leya did not meet the definition of an "unaccompanied alien child."   The Government therefore violated federal law in designating her as such, tearing her away from her father, and transferring her to HHS custody hundreds of miles away.   Because federal law prohibited the separation and transfer, the Government's acts were not discretionary.

---

[133] *See generally* 8 U.S.C. § 1232.  Such children are entitled to an array of protections including, among others, swift transfer out of the custody of federal agencies other than ORR, 8 U.S.C. § 1232(b)(3), prompt placement in "the least restrictive setting that is in the best interest of the child," *id.* § 1232(c)(2), special efforts to connect them with counsel, *id.* § 1232(c)(5), and eligibility for the appointment of a child advocate, *id.* § 1232(c)(6).  In addition, they are not subject to expedited removal proceedings under 8 U.S.C. § 1225 but are entitled to a full hearing before an immigration court under 8 U.S.C. § 1229a.  8 U.S.C. § 1232(a)(5)(D).

### 3. Defendant's separation and treatment of Jacob and Leya violated the *Flores* Consent Decree (the "*Flores* Agreement" or the "FSA").

165.    The *Flores* Agreement is a class-action consent decree entered in 1997 between the

Government and "[a]ll minors who are detained in the legal custody of the [Government's

immigration agencies],"[134] including those, like Leya, who arrived in the United States with their

parents to seek protection.[135]   The FSA sets national standards for the detention, release, and

treatment of immigrant children in the Government's custody, and its mandates are binding on the

Government's "agents, employees, contractors and/or successors in office."[136]   DHS, CBP, ICE,

HHS, and ORR, as successor organizations to the Immigration and Naturalization Service ("INS"),

must comply with the FSA's requirements.[137]

---

[134]   *Flores v. Reno*, FSA ¶ 10, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997), https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

[135]   *Flores v. Lynch*, 828 F.3d 898, 907–08 (9th Cir. 2016) (holding that *Flores* Agreement "unambiguously applies to accompanied minors"); *see also Bunikyte ex rel. Bunikiene* v. *Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.").

[136]   FSA ¶¶ 1, 9; *see also E.O.H.C. v. Sec'y U. S. Dep't of Homeland Sec.*, 950 F.3d 177, 192 (3d Cir. 2020) (noting that as "the District Judge overseeing the *Flores* Settlement Agreement in the Central District of California has repeatedly recognized, the settlement is a 'binding contract'" (quoting *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019)); *Bunikyte, ex rel. Buikiene v. Chertoff*, Nos. A-07-CA-164-SS, A-07-CA-165-SS, A-07-CA-166-SS, 2007 WL 1074070, at *8 (W.D. Tex. Apr. 9, 2007) ("The [*Flores*] Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS.").

[137]   *Flores v. Rosen*, 984 F.3d 720, 727 n.1 (9th Cir. 2020) ("Although the [*Flores*] Agreement refers to 'INS,' the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security ('DHS') and the Department of Health and Human Services ('HHS')); *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) ("[T]he [*Flores*] Settlement continues to govern those agencies that now carry out the functions of the former INS."); *Ruiz ex rel. E.R. v. United States*, No. 13-1241, 2014 WL 4662241, at *7 (E.D.N.Y. Sept. 18, 2014) (applying the *Flores* Agreement to CBP).

166.     The TVPRA partially codified the *Flores* Agreement and created standards for the treatment of unaccompanied minors in the Government's custody.    Together, the *Flores* Agreement and the TVPRA significantly limit the circumstances, duration, and manner of immigration detention of minor children.

167.     The FSA "creates a presumption in favor of release and favors family reunification."[138]    The Government intentionally designed the Family Separation Policy to circumvent and frustrate its obligation under the FSA to keep families together.  Pursuing a policy of deterrence by way of separating parents and children undermines an overriding purpose of the FSA, which is to maintain family integrity.

168.     Lacking the authority to designate Leya as an unaccompanied child and transfer her to HHS custody, DHS had two other alternatives.

- It could have released Leya "without unnecessary delay."[139]  The first preference under the FSA is release to a parent; the third preference is release to an "adult relative (brother, sister, aunt, uncle, or grandparent)."[140]  Federal regulations then in effect authorized DHS in certain circumstances to release a child "with an accompanying relative who is in detention."[141]  Further, the *Flores* district court had held that the FSA and the regulation required DHS to make an individualized assessment of whether release was appropriate.[142]

---

[138] *Flores v. Lynch*, 828 F.3d at 903.

[139] FSA ¶ 14.

[140] *Id.*

[141] *See Flores v. Sessions*, 394 F. Supp. 3d at 1064 (citing 8 C.F.R. § 212.5(b)(3) as then in effect), *appeal dismissed sub nom. Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019).

[142] *Id.* at 1066–67.

- If DHS had determined that release was inappropriate under the FSA, the alternative was to detain Leya for up to twenty days in an unlicensed facility[143] or transfer her within that period to a "licensed program," defined as a non-secure facility "licensed by an appropriate State agency" to provide services for "dependent children."[144]

169.    On information and belief, DHS undertook no "individualized review of the facts" to determine whether it would be in Leya's "best interests" as an *accompanied* minor[145] to be released "with an accompanying relative [her father] who is in detention"[146] or "to remain [even if only temporarily] with a parent who is in detention."[147]   On information and belief, DHS also failed to make an individualized determination of whether Leya's best interests would be served by release to "an available adult [not in detention] under Paragraph 14 of the Agreement," such as her paternal aunt who lived in New Jersey.[148]   Instead of following the course of action applicable to an accompanied child, DHS unlawfully designated Leya as unaccompanied and transferred her to HHS custody within hours of her apprehension.   DHS had no discretion to violate the FSA in this way.

---

[143]  The FSA requires expedition in releasing children from an unlicensed facility, FSA ¶¶ 12.A., 19, but permits an extension of the detention period "in the event of an emergency or influx of minors into the United States," *id.* ¶ 12.A.   The courts have held that this generally permits detention in such a facility for up to 20 days.  *Flores v. Sessions*, 394 F. Supp. 3d at 1070–71.

[144]  FSA ¶ 6.

[145]  *Flores v. Sessions*, 394 F. Supp. 3d at 1067 (emphasis added).

[146]  *Id.* at 1064 (citing 8 C.F.R. § 212.5(b)(3) as then in effect).

[147]  *Id.* at 1067.

[148]  *Id.*

170.    The FSA also requires the relevant agencies to hold minor children in conditions that are "safe and sanitary" and that recognize "the particular vulnerability of minors."[149]   In addition, facilities where immigrant children are detained "will provide access to toilets and sinks, . . . adequate temperature control and ventilation, . . . and contact with family members who were arrested with the minor."[150]

171.    By failing to provide adequate temperature control and sanitation in the facility where Leya was held, CBP violated this provision.  ICE and ORR violated the same provision by failing to put Leya and Jacob in contact after their separation.

172.    Although the El Paso Sector pilot had made clear that the Government lacked adequate systems to identify and track separated families, the Government implemented the family separation policy along the entire Southern Border without complying with the requirement that it "make and record the prompt and continuous efforts . . . toward family reunification."[151]   The Government's failure to record, or to record accurately, the family relationship of Leya and Jacob frustrated and delayed their reunification.  On information and belief, ICE and ORR also failed to make and record any efforts to reunify Leya and Jacob until a federal court ordered their reunification.

173.    Defendant had no discretion to implement the Family Separation Policy in violation of the *Flores* Agreement.

---

[149] FSA ¶ 12.A.

[150] *Id.*

[151] FSA ¶ 18.

### 4. Defendant's separation and treatment of Jacob and Leya violated binding agency standards that govern CBP.

174. CBP violated binding agency standards in its execution of the Family Separation Policy.

175. CBP's Short-Term Custody Policy ("Short-Term Custody Policy") establishes national policy for the short-term custody of individuals detained at facilities under the control of CBP.[152] The Short-Term Custody Policy governs noncitizen detainees' custody and care prior to their transfer to longer-term ICE detention facilities.

176. In 2015, CBP promulgated its National Standards on Transport, Escort, Detention, and Search (the "TEDS Standards" or "TEDS") to govern CBP officers' and employees' interaction with detained individuals.[153] Under the TEDS Standards, "[t]he safety of CBP employees, detainees, and the public is paramount during all aspects of CBP operations."[154]

177. Together, the Short-Term Custody Policy and the TEDS Standards govern CBP's required conduct and standards of care for both adult and child detainees in their custody. They supplement, but do not displace or otherwise alter, the Government's obligations under the FSA

---

[152] *See* Memorandum from David V. Aguilar, Chief, U.S. Border Patrol, to All Chief Patrol Agents 2 (June 2, 2008) ("Short-Term Custody Policy"), https://nomoredeaths.org/wp-content/uploads/2014/10/Hold-Rooms-Short-Term-Custody-Policy.pdf; *see also* U.S. Dep't of Homeland Sec., U.S. Customs and Border Protect., *Short-Term Detention Standards and Oversight*, *Fiscal Year 2015 Report to Congress* (Dec. 8, 2015), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Short-Term%20Detention%20Standards%20and%20Oversight_1.pdf.

[153] *See* U.S. Dep't of Homeland Sec., U.S. Customs and Border Prot., *National Standards on Transport, Escort, Detention, and Search* 3 (2015) ("TEDS"), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

[154] TEDS § 1.1.

and TVPRA concerning the custody and care of minor children.  These agency standards were in place at the time the Government devised, tested, and carried out its Family Separation Policy.

      **a.**      **CBP violated nondiscretionary agency standards and policies that require the preservation of family unity.**

178.    The TEDS require CBP to prioritize family unity, separating children from their parents only when "necessary."[155]

179.    No legal requirement or safety or security concern required Plaintiffs' separation. On information and belief, at the time it forcibly separated Leya from Jacob, CBP had no cause to believe that Jacob posed any threat or danger to his daughter or that he was otherwise unfit to care for her.  Moreover, the Government brought no criminal charges against Jacob, and therefore cannot explain the separation by reference to the alleged demands of adult criminal custody. Because there was no legitimate or compelling reason for the separation, and no law required the separation, CBP violated the applicable TEDS Standards by separating Leya from Jacob, designating her an "unaccompanied" minor, and sending them to facilities thousands of miles apart.

180.    CBP had no discretion to violate agency standards.

      **b.**      **CBP failed to provide Leya and Jacob with the adequate shelter and sanitary conditions required by its nondiscretionary agency standards and policies.**

181.    CBP policy mandates that "[a]ll detainees will be held under safe and humane conditions" and that "[a]ll detainees will be held under humane conditions of confinement that provide for their well being and general good health."[156]  CBP officers are required to provide

---

[155] *Id.* §§ 1.9, 4.3, 5.6.

[156] Short-Term Custody Policy ¶¶ 7, 7.2.

detainees with access to clean toilets, sinks, showers, and bedding, as well as basic toiletries.[157] CBP must maintain temperatures "within a reasonable and comfortable range" and may not use temperature controls "in a punitive manner."[158]  Juveniles, in particular, must be given "basic hygiene articles, and clean bedding."[159]

182.    CBP officers violated agency standards and their own clear, unequivocal, and nondiscretionary policies by detaining Leya and Jacob in an overcrowded, over-air-conditioned cellblock at the Rio Grande Valley Centralized Processing Center, denying them bedding or blankets other than a thin plastic mat and an aluminum foil sheet, and failing to ensure adequate temperature control.

183.    CBP officers failed to adhere to their own policies and procedures by exposing Leya and Jacob to deplorable, unsafe, and unhygienic conditions while they were held at the Rio Grande Valley Centralized Processing Center.  CBP officers not only callously denied them permission to shower, but the only restrooms available for their use—portable toilets—were filthy and unsanitary, covered in urine and used toilet paper.

184.    CBP had no discretion to fail to comply with its obligations under CBP's Short-Term Custody Policy and the TEDS Standards.

       **c.**     **CBP degraded and humiliated Jacob and Leya in violation of nondiscretionary agency standards and policies.**

185.    CBP employees "must treat all individuals with dignity and respect" and must carry out their duties "in a nondiscriminatory manner, with respect to all forms of protected status under federal law" and with "full respect for individual rights including equal protection under the law

---

[157] *Id.* ¶¶ 5.1, 6.10, 6.11, 6.14, 6.24, 7, 7.2; TEDS § 4.11.

[158] TEDS § 4.7.

[159] *Id.* § 5.6.

[and] due process."[160]  They must "speak and act with the utmost integrity and professionalism" and "conduct themselves in a manner that reflects positively on CBP at all times."[161]

186.    With respect to children, CBP officials must "consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation."[162]  Officers and agents "should recognize that juveniles experience situations differently than adults" and treat them as an "at-risk population" who may require additional care or oversight given their "particular vulnerability."[163]

187.    CBP officers violated these standards by committing gratuitous acts of cruelty, including but not limited to cursing at and taunting Jacob, threatening that he would "pay" for "kidnapping" Leya, baselessly insisting that he and Leya had no right to seek refuge in the United States, tearing Leya from her father's arms and carrying her away in the middle of the night, telling Jacob that he would never see his daughter again, and mocking the anguish that Jacob and Leya expressed.

188.    CBP officers further violated these standards by failing to consider Leya's "best interest[s]" entirely, let alone "at all decision points" as required by TEDS Section 1.6.  Ripping a screaming four-year-old out of her father's arms was neither "necessary" nor in Leya's "best interest."

---

[160] *Id.* § 1.4.

[161] *Id.* § 1.2.

[162] *Id.* § 1.6.

[163] *Id.* §§ 1.6, 5.1.

189.   CBP officers further violated these standards by not only disrespecting but wholly disregarding Jacob's and Leya's "individual rights including equal protection under the law, due process," and the right to family integrity implicit in these protections.[164]

190.   Moreover, CBP ignored the standard directing that searches be performed by officers who are "of the same gender, gender identity, or declared gender as the detainee being searched."[165]   In their initial searches of Leya, male CBP officers lifted her skirt and patted her down while female officers stood nearby.

191.   CBP had no discretion to fail to comply with these mandatory obligations under CBP's Short-Term Custody Policy and the TEDS Standards.

### 5.   Defendant's failure to establish contact between Jacob and Leya violated binding standards that govern ORR and ICE.

192.   ORR and ICE violated binding agency standards by failing to ensure contact between Jacob and Leya during their prolonged separation.

193.   The regulations that govern ORR—in addition to the mandates established by *Flores* and the TVPRA—are incorporated in the *ORR Guide: Children Entering the United States Unaccompanied* ("ORR Policy Guide").[166]

194.   ICE is governed by the Performance-Based National Detention Standards ("PBNDS"),[167] established in 2011, which "are designed to ensure a safe and secure detention

---

[164]   *Id.* § 1.4.

[165]   *Id.* § 5.5.

[166]   U.S. Dep't of Health & Hum. Servs., Off. of Refugee Resettlement, *ORR Guide: Children Entering the United States Unaccompanied* (Apr. 13, 2022), https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied.

[167]   U.S. Immigr. and Customs Enf't, *Performance Based National Detention Standards* (rev. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

environment that meets detainees' basic needs and is consistent with applicable legal requirements."[168]   The PBNDS regulate ICE officers' conduct and set standards of care for individuals detained within ICE's network of dedicated immigration facilities.

195.    The ORR Policy Guide requires the agency to ensure that children in its custody have regular contact with safe family members, including by responding to family members who try to contact the child.[169]

196.    ORR disregarded this mandate by failing to establish any communication between Leya and Jacob for seventy-four days, until Jacob's lawyers arranged a call.  ORR failed to make or document any findings that would raise concerns about putting Leya in contact with her father. Although Jacob called the number he had for Leya's caseworker every day for over a month, desperately seeking to speak with his daughter, ORR did not respond or arrange a call.  Following the call Jacob's lawyers arranged, the ORR caseworker's notes state: "The youth has been able to speak with her detained father over the phone and Mr. [L.C.] appears to be a loving and supportive father to the youth.  At this time, BCS case manager does not have any concerns in regards to the father-daughter relationship."[170]   Having had no reason to doubt that contact with Jacob was safe, ORR was obligated to establish contact between father and daughter.

197.    The PBNDS "Telephone Access" detention standard "ensures that detainees may maintain ties with their families and others in the community, legal representatives, consulates, courts and government agencies."[171]   In service of this goal, the PBNDS mandate that "[d]etainees

---

[168]   *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272 (11th Cir. 2020).

[169]   ORR Policy Guide §§ 1.5, 3.3.10.

[170]   ORR Case Review (July 8, 2018).

[171]   PBNDS § 5.6(I).

shall have reasonable and equitable access to reasonably priced telephone services."[172]  Moreover, indigent detainees, who lack sufficient funds in their accounts for ten days, "may request a call to immediate family or others in personal or family emergencies or on an as-needed basis."[173]

198.    Following his separation from Leya, Jacob was detained at the Port Isabel Service Processing Center, the Laredo Detention Center, and the Elizabeth Detention Center.  Although governed by the PBNDS, none of these facilities made it possible for Jacob to communicate with his daughter by telephone despite his frequent requests for help.  During extended periods, he lacked sufficient funds to make calls, but the facilities did not enable free calls.  For an extended period, he also lacked information about Leya's whereabouts.  When he finally learned of Leya's location from his sister, he remained unable to reach Leya.  As a result, Jacob and Leya had no contact for seventy-four of their ninety-three-day-long separation.

199.    Neither ORR nor ICE had discretion to violate their own regulations and standards of conduct.

## CLAIMS

200.    Plaintiffs plead all causes of action under Michigan law.

### FIRST CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

### Intentional Infliction of Emotional Distress

201.    Plaintiffs incorporate the allegations in all previous paragraphs.

202.    By engaging in the acts described in this Complaint—including, but not limited to, ripping Leya from Jacob's arms and forcibly separating them; swearing at Jacob and falsely accusing him of kidnapping Leya; withholding information from Jacob and Leya about each

---

[172]  *Id.* §§ 5.6(I); 5.6(II)(1).

[173]  *Id.* § 5.6(V)(E)(3).

other's whereabouts, well-being, or whether they would ever be reunited; depriving Jacob and Leya of contact with each other; and presenting another child on a video call with Jacob after having told him that he would be seeing his daughter for the first time in three months—the federal officers, officials, and employees referenced above engaged in extreme and outrageous conduct that is intolerable in a civilized society.

203.    These federal officers, officials, and employees undertook this outrageous conduct with an intent to cause, or with at least reckless disregard for the probability of causing, Plaintiffs to suffer severe emotional distress.

204.    As a direct and proximate cause of the federal officers', officials', and employees' conduct, Plaintiffs suffered and continue to suffer severe emotional distress, as well as physical manifestations of this trauma.

205.    Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**SECOND CAUSE OF ACTION**
**FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)**

**Negligent Infliction of Emotional Distress**

206.    Plaintiffs incorporate the allegations in all previous paragraphs.

207.    By engaging in the acts described in this Complaint—including, but not limited to, ripping Leya from Jacob's arms and forcibly separating them—the federal officers, officials, and employees referenced above inflicted serious injury on Leya.  Jacob was present at the time of the separation, holding his daughter and begging the federal officers not to take her from him.

208.    The federal officers, officials, and employees involved in the separation acted with negligence—at the very least—during the separation.

209.    The injury to Leya, which left her wailing and screaming for her father, caused Jacob, and would cause any reasonable parent, extreme and prolonged emotional and physical distress.   The shock Jacob suffered resulted in physical harm including repeated, piercing headaches; insomnia; loss of appetite and accompanying weight loss; and extreme fear and anxiety.

210.    Under the FTCA, the United States is liable to Jacob for negligent infliction of emotional distress.

### THIRD CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

### Negligence

211.    Plaintiffs incorporate the allegations in all previous paragraphs.

212.    The federal officers, officials, and employees referenced herein had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause them harm or injury.   The federal officers, officials, and employees also had mandatory, nondiscretionary duties of care, including but not limited to those imposed by the United States Constitution, federal statutes, the *Flores* Agreement, and agency standards and regulations.

213.    By engaging in the acts described in this Complaint, the federal officers, officials, and employees referenced above, at the direction of Defendant, failed to act with ordinary care and breached the duties of care they owed to Plaintiffs.   These breaches arose from conduct including, but not limited to, ripping Leya from Jacob's arms and forcibly separating them; swearing at Jacob and falsely accusing him of kidnapping Leya; withholding information from Jacob and Leya about each other's whereabouts, well-being, or whether they would ever be reunited; and depriving Jacob and Leya of contact with each other.   Additionally, the Government failed to implement sufficient

mechanisms to track separated children, which resulted in officials putting an unknown child on a video call with Jacob after telling Jacob he would be seeing Leya.

214.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages stemming from their mental anguish, emotional and psychological trauma, physical manifestations of anxiety and stress, and impairment of their parent-child relationship.

215.    Under the FTCA, the United States is liable to Plaintiffs for negligence.

### FOURTH CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

### Negligent Undertaking

216.    Plaintiffs incorporate the allegations in all previous paragraphs.

217.    By taking Plaintiffs into custody, Defendant assumed duties of care to them pursuant to the United States Constitution, federal statutes and regulations, and agency standards. At a minimum, these duties require federal officers, officials, and employees to exercise due care in the treatment of detainees and to avoid causing them unwarranted harm.

218.    Defendant breached its duties of care to Plaintiffs by conduct including, but not limited to, ripping Leya from Jacob's arms and forcibly separating them; swearing at Jacob and falsely accusing him of kidnapping Leya; withholding information from Jacob and Leya about each other's whereabouts, well-being, or whether they would ever be reunited; depriving Jacob and Leya of contact with each other; and mishandling the reunification process by setting up a videoconference between Jacob and a child who was not his daughter.

219.    As a proximate result of Defendant's lack of due care in designing and implementing the Family Separation Policy, subjecting detainees in its control to the cruelty and incompetence described above, Jacob and Leya suffered severe harm, including physical harm in

the form of intense headaches, sleep disturbance, loss of appetite, weight loss, skin rashes, stomach pain, and debilitating fear and anxiety.

220.     Under the FTCA, the United States is liable to Plaintiffs for negligent undertaking.

### FIFTH CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

**Breach of Fiduciary Duty**

221.     Plaintiffs incorporate the allegations in all previous paragraphs.

222.     Plaintiffs migrated to the United States to seek humanitarian protection, and Defendant took them into custody.  Plaintiffs trusted and relied on Defendant to provide for their safety and well-being while they were in custody, giving rise to a fiduciary relationship between Plaintiffs and Defendant.

223.     Further, Defendant, having separated Leya from her father, assumed legal custody of and stood *in loco parentis* to her.  As Leya's legal custodian, Defendant created a fiduciary relationship with her and assumed an obligation to act in her best interests.

224.     By engaging in the various acts and omissions described in this Complaint— including, but not limited to, ripping Leya from Jacob's arms and forcibly separating them; swearing at Jacob and falsely accusing him of kidnapping Leya; withholding information from Jacob and Leya about each other's whereabouts, well-being, or whether they would ever be reunited; depriving Jacob and Leya of contact with each other; and presenting another child on a video call with Jacob after having told him that he would be seeing his daughter for the first time in three months—Defendant breached its fiduciary duties to Plaintiffs.

225.     As a direct and proximate result of those breaches, Plaintiffs suffered and continue to suffer mental anguish, emotional and psychological trauma, physical manifestations of anxiety and stress, and impairment of their parent-child relationship.

226.   Under the FTCA, the United States is liable to Plaintiffs for breach of fiduciary duty.

**SIXTH CAUSE OF ACTION**
**FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)**

**Child Abduction**

227.   Plaintiffs incorporate the allegations in all previous paragraphs.

228.   The federal officers, officials, and employees referenced herein intentionally ripped Leya from Jacob's arms and forcibly separated them for ninety-three days.

229.   On information and belief, at no time did Defendant investigate or make any finding regarding whether Jacob presented a danger to Leya or was in any way unfit to maintain care and custody of his daughter.

230.   In addition to taking and retaining possession of Leya, these federal officers, officials, and employees concealed Leya's whereabouts from Jacob throughout the separation, leaving him to learn of her location through family members he was eventually able to contact.  At no time during the separation did the Government facilitate contact between Jacob and Leya.  Their first phone call, occurring after seventy-four days of separation, was not arranged by the Government but by Jacob's then-pro bono counsel.

231.   The federal officers, officials, and employees were in possession of evidence that Jacob is Leya's biological father and that he had lawful custody of his daughter.   Upon his apprehension, Jacob presented the arresting officers with his Honduran identity card, her birth certificate naming him as her father, and a notarized letter from his life-partner Melisa (Leya's mother) consenting to his travel with Leya.  On information and belief, no federal officer, official, or employee ever contested or had any basis to contest their parent-child relationship or Jacob's lawful custody of Leya.  The federal officers, officials, and employees were also aware that Jacob

did not consent to have his child taken away from him. Indeed, he begged on his knees at the time of the forcible separation to have Leya returned to him.

232.    As a direct and proximate result of Defendant's conduct described herein, Plaintiffs suffered substantial damages stemming from their mental anguish, interference with their parent-child relationship, emotional and psychological trauma, and physical manifestations of anxiety and stress.

233.    Under the FTCA, the United States is liable to Jacob for child abduction.

### SEVENTH CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

### Abuse of Process

234.    Plaintiffs incorporate the allegations in all previous paragraphs.

235.    The federal officers, officials, and employees referenced herein, at the direction of Defendant, abused legal process when they unlawfully designated Leya an "unaccompanied alien child" under the TVPRA and relied on this designation, not to protect her best interest, but to wrest her from her father and detain her in a facility thousands of miles away from him.

236.    The designation itself was illegal because Leya did not meet the definition of an "unaccompanied alien child" under 6 U.S.C. § 279(g)(2): Jacob, her biological father crossed the border with her and remained available to retain care and custody of her, either in family detention or on release. Although a "UAC" designation is meant to protect a child who enters the United States without a parent or guardian, the federal officers, officials, and employees referenced here, acting at the direction of Defendant, used the designation instead to effectuate Leya's unlawful separation and separate detention from her father.

237.    The UAC designation and resulting forced separation were for the purpose of traumatizing Plaintiffs and deterring other migrant families from seeking humanitarian protection in the United States, uses neither warranted nor authorized by the process.

238.    The federal officers, officials, and employees who engaged in the acts described in this Complaint were investigative or law enforcement officers acting within the scope of their employment.

239.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages stemming from their mental anguish, emotional and psychological trauma, physical manifestations of anxiety and stress, and impairment of their parent-child relationship.

240.    Under the FTCA, the United States is liable to Plaintiffs for abuse of process.

**EIGHTH CAUSE OF ACTION**
**FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)**

**Assault and Battery**

241.    Plaintiffs incorporate the allegations in all previous paragraphs.

242.    As set forth in the preceding paragraphs, by the various acts and omissions of the federal officers, officials, and employees, Defendant intended to injure Plaintiffs by separating them.  Defendant anticipated and intended the trauma that resulted from the unlawful separations as a means to deter other Central American families from crossing the Southern Border.

243.    By engaging in the unlawful acts described in this Complaint, including but not limited to executing cross-gender searches of Leya in which male officers felt under her clothes and lifted her skirt, and later ripping her away from her father and carrying her off while she screamed, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Leya to suffer mental and physical injuries.

244.    By engaging in the unlawful acts described in this Complaint, including but not limited to ripping Leya away from Jacob and carrying her off while he begged on his knees to keep her, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Jacob to suffer mental and physical injuries.

245.    The federal officers, officials, and employees who engaged in the acts described in this Complaint were investigative or law enforcement officers acting within the scope of their employment.

246.    Under the FTCA, the United States is liable to Plaintiffs for assault and battery.

### NINTH CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT—28 U.S.C. § 1346(b)

### Loss of Consortium

247.    Plaintiffs incorporate the allegations in all previous paragraphs.

248.    By injuring Jacob through the legally cognizable tortious conduct described above, Defendant deprived Leya of the society, companionship, and protection of her father, not only during the 93 days of their separation, but also following their reunification when her anger about the separation and her acute fear of losing her father again continued to impair and disrupt their interactions.

249.    Under the FTCA, the United States is liable to Leya for the loss of her father's consortium.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Award compensatory damages in the amount of $3,000,000 for harm to Jacob, resulting from Defendant's conduct;

B.      Award compensatory damages in the amount of $3,000,000 for harm to Leya,

resulting from Defendant's conduct;

C.      Award attorneys' fees and costs pursuant to, among other provisions, the Equal

Access to Justice Act, 28 U.S.C. § 2412; and

D.      Grant other such other and further relief as the Court may deem just and

appropriate, including all equitable relief to which Plaintiffs are entitled.


November 14, 2022

s/ Catherine Weiss
Catherine Weiss
Amanda Sewanan *(admission pending)*
Michelle L. Goldman
Pati Candelario
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500

*Pro Bono Counsel for Plaintiffs*

## <u>CERTIFICATION UNDER L. CIV. R. 11.2</u>

I certify that the matter in controversy is not the subject of any other action pending in any

court, or of any pending arbitration or administrative proceeding.


<u>s/ Catherine Weiss</u>
Catherine Weiss
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500